PALMER et al. v. JORDAN MACH. CO.

(Circuit Court, N. D. New York. January 31, 1911.)

No. 7,230.

1. PATENTS (§ 328*)—INFRINGEMENT—APPARATUS FOR INVERTING TUBULAR FABRICS.

The Palmer patent, No. 878,995, for an apparatus for inverting tubular fabrics, covers a combination consisting of a horizontal tube or cylinder upon which the fabric is to be drawn, to be inverted or turned the other side out when it is removed. At one end of the tube are two vertical bearing frames, one on each side, hinged at the bottom, each with an upright shaft carrying a feed roll, the rolls being adapted to engage opposite sides of the tube, and, when rotated, to take hold of the end of the fabric, and draw and press it onto the tube. To prevent tearing or injury to the fabric and to provide for inequalities in thickness, one element of the combination as shown by the specification and drawings and enumerated in most of the claims is a coil spring making a resilient connection between the tops of the two frames, which normally holds the rolls against the sides of the tube, but with a yielding pressure. *Held* that, in view of the prior art and the proceedings in the Patent Office, such spring must be considered an essential feature of the invention, and that the use of an iron rod, threaded at both ends, making a rigid connection between the frames which can be lengthened or shortened by turning the rod by means of a lever, as in the machine of the Jordan patent, No. 960,227, was not the substitution of an equivalent for the spring, and that the Jordan machine which secures the yielding pressure of the rolls by means of internal springs does not infringe the Palmer patent.

2. PATENTS (§ 22*)—INFRINGEMENT—SUBSTITUTION OF EQUIVALENTS.

The test of equivalency with respect to a substituted element in a patented combination is whether it operates in substantially the same way to produce substantially the same result in the combination.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 24; Dec. Dig. § 22.*]

---

**3.** PATENTS (§ 287*)—SUIT FOR INFRINGEMENT—LIABILITY OF CORPORATION.

A manufacturer made and sold certain machines which infringed complainant's patent. Before the machines had been accepted and paid for, he transferred his business to defendant corporation of which he became president, and also transferred his accounts receivable, among which was that for the infringing machines, and bills therefor were rendered and collected by defendant. *Held* that, as defendant never became owner of the machines, it was not chargeable as an infringer for having used or sold the same.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 457, 458; Dec. Dig. § 287.*]

**4.** PATENTS (§ 283*)—SUIT FOR INFRINGEMENT—DEFENSES—ESTOPPEL.

The president of defendant corporation, who had prior to its organization built and sold machines infringing complainant's patent, which had not been paid for, the accounts for which had been transferred to defendant, on behalf of defendant wrote a letter to the purchaser, in which he acknowledged the sale of the machines by defendant, and guaranteed in its behalf that they were not infringements. *Held* that, while such letter was an admission of liability to the purchaser, it did not estop defendant as against complainant from showing in defense to a suit for the infringement that it did not in fact build or sell the machines.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 283.*]

**5.** WORDS AND PHRASES—"YIELDING MEANS"—"YIELDING MECHANISM."

The underlying idea of "yielding means" or "yielding mechanism" is something that will give way under pressure.

**6.** WORDS AND PHRASES—"NORMALLY."

The word "normally" is defined "as a rule; regularly; according to a rule, general custom," etc.

[Ed. Note.—For other definitions, see Words and Phrases, vol. 5, p. 4829.]

**7.** SALES (§ 1*)—"SALE BY AGREEMENT."

To constitute a "sale by agreement," there must be an intent to sell and an intent to purchase, a purpose to pass title.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 1, 3–5; Dec. Dig. § 1.*]

In Equity. Suit by William B. Palmer and Jesse V. Palmer against the Jordan Machine Company for infringement of letters patent No. 878,995 for apparatus for inverting tubular fabrics, granted to William B. Palmer February 11, 1908. On final hearing. Decree for defendant.

Herbert Van Kirk and Daniel A. Rollins, for complainants.
Walter E. Ward, for defendant.

RAY, District Judge. The patent in suit, No. 878,995, was granted to William B. Palmer February 11, 1908, on application filed December 5, 1905, after having been amended and rejected as to some of the claims in the Patent Office. Claims 1, 2, 3, 5, 6, 7, and 8 are in issue. The patent relates to "apparatus for inverting tubular fabrics"; that is, turning them inside out. The open end of the tubular fabric is placed upon a cylinder or roller of suitable size and properly supported, but at or near one end only, usually in a horizontal position, and the purpose of the mechanism, quite simple and old in every detail, except in the combination and this particular art, is to push

a great or considerable length of tubular fabric onto this cylinder, or roller, to the end that when on, as we would put a stocking on a suitable roller, a person may take hold of one end of the fabric, that first placed on the roller, and by pulling backward finally strip it therefrom, and in the process, of course, "inverting" it or turning it "inside out." Once on the roller, the "inversion" may be done in more ways than one, but the patent does not relate particularly to that part of the process. This patent has nothing to do with the means for supporting the cylinder or roller. We have two upright frames opposite to and at a little distance from each other, and each frame is hinged to a stationary bed piece, so they will swing or move both towards and away from each other freely. Each frame carries or supports an upright shaft rotatively mounted in suitable bearings attached to or supported by its frame. Each shaft carries at or near its upper end a feed roll, which revolves with its shaft. It is not necessary to particularly describe the feed rolls, as they were old in this and other arts. Each shaft might carry two or more feed rolls. It is necessary to have the shafts of the same length and the feed roll of each at the same distance from the upper end, so that, when the frames are swung together, the two feed rolls will meet, and hence, before meeting, grasp, so to speak, the interposed end of the above-mentioned cylinder or roller having thereon at the commencement of the operation of "inverting" one end of the fabric. It is seen, at once, that if these two frames carrying the shafts, and hence the feed rolls, are swung towards each other until the feed rolls grasp or come in contact with the fabric on the interposed cylinder, roller, or tube (tube in the patent), and then, revolved in the proper direction, they will, acting in unison, pull and gather and push the fabric along on the said cylinder, roller, or tube, hundreds of yards if necessary. There are, of course, means for revolving the shafts and attached feed rolls. It is apparent that the frames and feed rolls must be moved away from each other to place in position the tube used to carry or take up the fabric; and also when removing it after having been loaded; also, that the said frames, and hence the feed rolls, must be moved towards each other until they grasp the tube and end of the fabric thereon when the operation of loading the tube begins; also, that the said feed rolls carried by the shafts, and, in turn, by the frames, must be kept in contact with said tube or roller taking up and carrying the fabric so long as the operation of taking up and gathering thereon continues. To bring these frames towards each other and hold them in position as stated, the patent in suit, in the specifications, and also in the drawings forming a part thereof, describes and shows "a coil spring," the one end attached to the one frame and the other end to the other frame. With nothing further the feed rolls would be constantly drawn together or in contact with the tube when there. To keep them apart the said patent (and drawings) shows "a brace in the form of a toggle"; that is, a brace with a toggle joint, one end of the brace being attached to one frame and the other end to the other frame.

It is here, in connection with this means of bringing the two frames (and consequently the feed rolls) towards each other and holding them

together and also apart, that this controversy arises. The defendant uses no brace or toggle joint, nor does it use a coil spring or any spring for this purpose, or to perform the function mentioned, in whole or in part. The defendant uses a solid straight bar of iron screw threaded at each end and one end enters a correspondingly screw threaded aperture in one frame and the other end a correspondingly screw threaded aperture in the other frame and this bar is turned with a crank or lever by hand, so that by turning this rigid bar, screw threaded as described in one direction, the frames are made to approach each other, while by turning it in the other direction such frames are made to recede from each other. The "coil spring" shown and described in the patent is self-operating, automatic, so to speak, in bringing and holding the frames towards each other and in bringing and holding the feed rolls in contact with the fabric on the tube or roller. The brace with toggle joint is used to hold them apart and in pushing them apart.

I will insert the claims in issue before referring to the details of the specification and drawings. They read as follows:

"1. In an apparatus of the class described, the combination with the fabric-supporting tube; of a pair of feed rolls adapted to engage the opposite sides of said tube; and yielding means for forcing said feed rolls against said tube.

"2. In an apparatus of the class described, the combination with a fabric-supporting tube; of a pair of feed rolls disposed on opposite sides of said tube; yielding means for forcing said feed rolls toward each other; and locking mechanism for maintaining said rolls withdrawn from said tube at certain times.

"3. In an apparatus of the class described, the combination with a fabric-supporting tube; of a pair of bearing frames pivotally mounted at one side of said tube; yielding mechanism for drawing said frames toward each other; a pair of shafts rotatively mounted in bearings in the respective bearing frames; feed rolls fixed upon said shafts respectively adapted to engage opposite sides of said tube; and means for transmitting power to said shafts. * * *

"5. In a machine of the character described, the combination with a fabric-supporting tube, of a pair of bearing frames, one mounted at each side of the tube, a resilient connection between the two frames whereby the frames are drawn towards each other, and a rotatable feed roll carried by each of said frames, said feed rolls adapted to engage opposite sides of the tube.

"6. In a machine of the character described, the combination with a fabric-supporting tube, of a pair of bearing frames, one mounted at each side of the tube, a resilient connection between the two frames whereby the frames are drawn towards each other, a rotatable feed roll carried by each of said frames, said feed rolls adapted to engage opposite sides of the tube, and means for maintaining said rolls out of engagement with said tube.

"7. An apparatus of the class described comprising a fabric-supporting tube, a pair of swinging frames, means for normally drawing said frames towards each other, an upright shaft carried by each of the frames, a feed roll connected with each of the shafts, said feed rolls positioned one at each side of the tube, and means for operating the shafts.

"8. An apparatus of the class described comprising a fabric-supporting tube, a pair of swinging frames, means for normally drawing said frames towards each other, an upright shaft carried by each of the frames, a feed roll connected with each of the shafts, said feed rolls positioned one at each side of the tube, means for operating the shafts, and means for maintaining said rolls out of engagement with said tube."

It is noticed that claim 1 is a combination claim calling for (1) the fabric-supporting tube which I have referred to also as a roller or cylinder; (2) a pair of feed rolls adapted to engage the opposite sides of said tube; and (3) yielding means for forcing said feed rolls against said tube. We have no reference to any means for forcing the feed rolls away from the tube, and, when we turn to Fig. 2 of the drawings and look at the coil spring, 7, and then read the following in the specification, "A coil spring, 7, connects together the upper vibratory ends of said bearing frames tending to draw the same together so as to force the feed rolls, 3, against opposite sides of the supporting tube, 1, as indicated by dotted lines in Fig. 2," we can have no doubt as to what is intended by "yielding means." This claim certainly refers to a coil spring or its well-known equivalent, something that is in and of itself yielding as it calls for "yielding means for forcing said feed rolls against said tube." I am of the opinion that a solid bar of iron or steel, screw threaded at each end, and having each end, respectively, inserted in screw threaded apertures in the two frames and operated by hand in the manner described to force the feed rolls against the tube, is not "yielding means for forcing said feed rolls against said tube" within the meaning of this claim or patent or a well-known equivalent therefor. I hold that this claim is not infringed by the defendant, for the reason that the defendant does not use a combination having as one of its elements yielding means for forcing feed rolls against the tube or a combination containing a well-known equivalent therefor.

Claim 2 also calls for yielding means for forcing said feed rolls toward each other, and also calls for locking mechanism for maintaining said rolls withdrawn from said tube at certain times. The locking mechanism referred to in this claim is evidently the brace with toggle joint. I do not think that the threaded iron or steel bar referred to is locking mechanism. However, it may be regarded as an equivalent for the locking mechanism of the patent in suit. It is not necessary to discuss that proposition, inasmuch as the defendant's machine or apparatus does not have yielding means for forcing said feed rolls toward each other, and hence defendant does not infringe claim 2.

Claim 3 of the patent in suit substitutes "yielding mechanism for drawing said frames toward each other" for the "yielding means for forcing said feed rolls toward each other" or "against said tube," as claimed in claims 1 and 2. I do not regard this substitution as of importance. Evidently the patentee referred to and intended to claim a coil spring or its well-known mechanical equivalent, and had reference to mechanism of that character. I hold that the solid bar of iron or steel and operating as described and used by the defendant is not yielding mechanism within the meaning of claim 3 or its well-known mechanical equivalent.

Coming to claims 5 and 6, in place of "yielding means" and "yielding mechanism" for drawing the frames toward each other or against the tube, we have as an element of said claims 5 and 6 "a resilient

connection between two frames whereby the frames are drawn towards each other." I am of the opinion, and hold, that the steel or iron bar described and used in the manner described to connect the two frames and draw them towards each other and force them away from each other is not "a resilient connection between the two frames," nor a well-known mechanical equivalent for a resilient connection, and I therefore hold that the defendant does not infringe either claim 5 or claim 6, as it does not use or have any resilient connection between the two frames for the purpose mentioned or for any other purpose.

[5] The underlying idea of "yielding means" or "yielding mechanism" is something that will give way under pressure. The body of a carriage, road or railroad carriage, is connected to the axles by "yielding means" or "yielding mechanism," such as the ordinary carriage springs or strong coil springs. The connecting means or mechanism yield under pressure, under the load, and allow or compel the body and axle to approach each other. Remove the load or pressure, and the carriage body springs back into position. So coil springs may be used which hold the two bodies together or near together and pressure is used to separate them; that is, on pressure the one moves away from the other, but remove the pressure tending to separate them, and they come together again by force of the yielding means or mechanism connecting them. The two bodies might be separated by means of four levers, one at each corner, and by pressing on the outer end of such levers. Remove the pressure or weight on the levers, and the two bodies would come together, the top one dropping by force of gravity or weight to the lower one. Would this be yielding means or yielding mechanism for either bringing them together or forcing them apart? So the body of a car may be raised from the tracks by means of jackscrews as a building may be raised from its foundation thereby; that is, we turn the lever of the jackscrew and by the operation of the screw the one is raised from the other, and by reversing the motion of the jackscrew lever it is lowered. Are jackscrews operated in this manner "yielding means" or "yielding mechanism" within the meaning of these claims?

Webster defines "yielding" as "inclined to give way or comply; flexible; compliant." Century dictionary defines "yield," verb, intrans., "1. To produce; bear; give a return for labor; as the tree yields abundantly; the mines yielded better last year. 2. To give way, as to superior physical force, to a conqueror," etc. And "yielding" as follows: "(3) A giving away under physical pressure; a settling." And "yielding" p. a., "Inclined or fit to yield in any sense of the word; especially, soft; compliant; unresisting."

When we operate the screw threaded bar of defendant's apparatus by means of a lever or wheel, we either draw or push the hinged frames carrying the shafts and attached feed rolls by the force applied to the lever and communicated to the bar, and thence to the screw threads. No part of this bar yields or gives way to the physical pressure. It is of the same length, size, and shape, and maintains its position. It yields to nothing except as turned on its axes by the

lever. Not so with a coiled spring or a yielding spring of any description. An open coil may be pressed together by force, and it yields, contracts, and carries whatever is attached thereto with it. Remove the force and it springs apart, resumes its normal position, and carries with it whatever is attached. A closed coil spring may be drawn apart, partially uncoiled, so to speak, by force, and, when the force is removed, the spring will again coil; that is, draw together, carrying with it whatever is attached. Not interfered with, it draws from both ends with equal force, and if, as here, the frames and feed rolls, the things attached, are movable, they will be drawn together and kept in self-contact or in contact or engagement with whatever is placed between them, but in a yielding manner or yielding grasp, so as to allow for the passage of unequal or uneven surfaces without crushing or cutting; that is, without injury to the fabric. The recoil of the spring does this—without the application of outside force—and such a spring is self-acting and continuous in its action. This mode of operation is very different from that of a rigid steel or iron bar, turned with a lever and where at every turn of the lever the position of the frames and feed rolls becomes fixed and unyielding. We do not by substituting the bar have substituted means operating in substantially the same way to produce substantially the same results. The screw threaded bar does not yield to force, except as it is turned on its axis, but the hinged frames and the attached feed rolls do in a way as they are forcibly drawn together by means of the screw threads when the bar is turned. However, otherwise they remain rigidly in position, and are unyielding to uneven surfaces passing between the feed rolls. Unless a jackscrew is the mechanical equivalent of a coil spring, when yielding means or yielding mechanism are called for, a rigid iron or steel bar, screw threaded at each end and turned with a lever, is not. I cannot assent to any such proposition. In the patent in suit Fig. 2 shows a close coil spring extended, uncoiled by force, and held in that position by means of the brace toggle joint. Unlock this toggle, and the coil spring would resume its normal position, and draw the feed rolls against, and engage the fabric on the tube or roller in a yielding manner.

Claims 5 and 6, which have, as the principal element of operativeness, "a resilient connection between the two frames whereby the two frames are drawn towards each other," are much further away from defendant's machine. That a rigid steel or iron bar screw threaded at each end and inserted in corresponding screw threaded apertures in the hinged frames, respectively, is a "resilient connection between the two frames," is repugnant to my ideas of resiliency. Webster says of "resilient," as follows:

"Leaping back, rebounding, recoiling, returning to or resuming the original position or shape. Specif. Mech., of a body capable of withstanding sudden shock without permanent deformation or rupture. (2) Fig. Possessing power of recovery, elastic; buoyant."

And of "resilience" he says:

"The energy given out by a body which is released after being strained up to its elastic limit, or the energy to deform a bar to its elastic limit."

The Century dictionary defines "resilience" thus: "The act of resiling (that is, starting back, recoiling) leaping or springing back; the act of rebounding"—and defines "resilient" as "having resilience; inclined to leap or spring back; leaping or springing back; rebounding." It is plain that a "coil spring connection" answers to a "resilient connection," but I have never discovered, and there is no credible evidence in this case to show, that a jackscrew or a rigid iron bar screw threaded at each end and turned by a lever forms a "resilient connection" between two objects which it is designed to move and allowed to move. The brace with toggle joint forms no part of these "yielding means for forcing said feed rolls against said tube" or "towards each other," or of the "yielding mechanism for drawing said frames towards each other," or of the "resilient connection between the two frames whereby the two frames are drawn towards each other." That toggle jointed brace is made a distinct element of claims 6 and 8.

The patentee, Palmer, has defined the use of this toggle brace as follows:

"To facilitate the application of the fabric to the supporting tube and its removal therefrom, I provide a brace, 12, in the form of a toggle, the outer ends of which are hinged to the respective bearing frames, 5, said toggle when fully opened serving to brace and hold said frames apart with the rolls, 3, withdrawn from the supporting tube, 1, in which position said toggle is adapted to be automatically locked by a spring-catch, 13, which may be of any known form adapted to be released by the hand of the operator when it is desired to close the toggle to permit the spring, 7, to draw the bearing frames together."

This further emphasizes the kind of connection and nature thereof he intends as part of his invention for bringing the two frames and feed rolls together or in engagement with the tube and fabric carried thereby. We find no suggestion in the drawings or specification of any means for drawing these frames, and the shafts and feed rolls carried thereby, towards each other aside from the coil spring, which, of course, includes any well-known mechanical equivalent for such a spring, but no suggestion of the use of any or all means that would bring them together or move them towards each other. The patentee is not entitled to any such broad construction or interpretation of his patent as that. He was not a pioneer in this art or this branch of the art, as we shall see, and he met with limitations in the Patent Office.

### Claims 7 and 8.

When we come to claims 7 and 8, we have a somewhat different proposition. Claim 7 calls for an apparatus of the "class described," comprising (1) a fabric-supporting tube; (2) a pair of swinging frames; (3) means for normally drawing said frames towards each other; (4) an upright shaft carried by each of the frames; (5) a feed roll connected with each of the shafts, said feed rolls positioned one at each side of the tube; and (6) means for operating the shafts.

[6] Broadly and liberally construed, this claim, as well as claim 8, covers the defendant's apparatus or machine. The defendant has in its combination a tube, a pair of swinging frames, an upright shaft car-

ried by or connected with each of said frames, and a feed roll on each shaft positioned one at each side of the tube, and means for operating, revolving the shafts, and feed rolls thereon. The defendant also has means, the means described, for "normally" drawing said frames towards each other. The iron or steel bar described, screw threaded at each end, and connected with the movable frames in the manner described, when turned by crank or lever, operates to "normally" draw said frames towards each other, and consequently to bring the feed rolls carried by the shafts into engagement with the fabric on the tube, and hold them there rigidly and unyieldingly. This seems to be contrary to the spirit and purpose of the patent in suit. When the shafts are revolved, the feed rolls pull, gather "full," and push the fabric on and onto the tube or roller. The word "normally" is thus defined: "As a rule; regularly; according to a rule, general custom," etc. It is evident, I think, that the word "normally" was used to indicate that the frames are to be drawn towards each other regularly and uniformly or with equal force, so the feed rolls will grasp or engage the fabric with equal force on each side of the tube; that is, with uniform action in both feed rolls. The rigid screw threaded bar of defendant's machine does this with precision and certainty, assuming the feed rolls to be the same, but, as stated, they so hold the feed rolls in engagement with the fabric on the tube in a very different manner from that of the yielding coil spring of the drawings and specification of this patent. If the complainants are entitled to this broad construction of claims 7 and 8, the defendant infringes. But, in view of the specification and drawings and the prior art and the limitations of the Patent Office, are complainants entitled to such construction? Was Palmer entitled to such a broad claim as is now asserted? That is, to any and all means for drawing the frames and feed rolls towards each other, provided it is done regularly and according to a rule, or is the patent limited to resilient or yielding means in this regard? To determine this we must consult the prior art, the action of the Patent Office, and the patent itself.

The patentee says:

"My invention relates more particularly to an improved means for depositing the web of fabric upon the tube preparatory to inversion of the web. The principal objects of the invention are to facilitate the depositing of the tube of fabric upon the supporting tube preparatory to inversion, and to prevent injury to the fabric while thus being placed upon the supporting tube."

This idea of preventing injury to the fabric by cutting, tearing, wearing, etc., is made one of the two principal objects of the invention. It is readily seen that the fabric rigidly pressed against and pushed along on the tube by unyielding means might be cut or torn or worn through as was sometimes done in the prior art. Hence the leading and controlling idea of this improved machine to provide "yielding means" and "yielding mechanism" and "resilient connection between the two frames" and the "coil spring" connecting the frames carrying the shafts and feed rolls (which grasp the fabric), all for the purpose of providing means for yieldingly forcing the feed rolls against the fabric supporting tube, or fabric on the said tube, and not for

the purpose of providing "yieldingly supported" feed rolls, or feed rolls with "yielding supports," or rigid "feed rolls," or feed rolls having an "interrupted yielding surface," or feed rolls with "peripherally grooved body and straps of flexible material secured transversely of said grooves," etc., claims for all of which were rejected in the Patent Office.

Mr. Gooding, complainants' expert, admits, in answer to cross-interrogatory 45, that the coil spring 7 of the Palmer patent, or its mechanical equivalent, in combination with the feed rolls and tube, is essential and material to the successful operation of a machine constructed under and in accordance with the Palmer patent in suit; that is, the feed rolls must be able to move both towards and away from the tube carrying the fabric during the feeding operation. We have seen that in the Palmer patent this movement of the feed rolls is made possible and certain by the introduction into the drawings of the coil spring, into the specification of the description of that spring as already quoted, and into the claims of the patent the distinct element variously described as "yielding means for forcing said feed rolls against said tube," and "yielding means for forcing said feed rolls toward each other," and "yielding mechanism for drawing said frames toward each other," and "a resilient connection between the two frames whereby the two frames are drawn towards each other." Mr. Gooding then states, in order to sustain his contention, that defendant's machine has the mechanical equivalent of this essential coil spring; that (answer to cross-interrogatory 46):

"The mechanical equivalent of said yielding means (coil spring, etc.) would be any construction whereby the peripheries of said feed rolls move inwardly toward the tube or outwardly away from the tube during the feeding operation so as to feed the fabric onto the tube by the rotation of the rolls without spoiling the fabric."

If this be true, it is not necessary to have any coil spring or any other connection whatever between the two frames and the shafts carried thereby. Make the frames and shafts rigidly upright, and attach to each of the shafts a feed roll of entirely new design and construction with inside springs or mechanism which will enlarge the same, so that the "peripheries of said feed rolls will move inwardly toward the tube or outwardly away from the tube during the feeding operation," and we have an infringing machine if the theory of Mr. Gooding is accepted. If two elements of a valid patent are combined in one element by an alleged infringer so that the combination element performs the functions of the two operating in substantially the same way to produce the same result, infringement is not avoided. That is not this case. If an essential element of a device or apparatus is left out, and there is no substitution, then infringement is avoided. That is not this case. If an essential element of a patented device is left out, and there is a substitution, the question at once arises whether or not the substituted element is the well-known mechanical equivalent of the one omitted. If it is such equivalent, infringement is not avoided. If not, then we have a new device or apparatus, and there is no infringement even if the result obtained is precisely the same.

[2] The test is, Does the substituted element operate in substantial-

ly the same way to produce substantially the same result in the combination? Does it perform the same function? Cautrill v. Wallick, 117 U. S. 689, 6 Sup. Ct. 970, 29 L. Ed. 1017. This Palmer patent was granted when, and only when, an element was introduced which carried the two feed rolls towards each other by yielding or resilient means. The patent as finally allowed and issued did not relate in any way to the size, form, or composition or flexibility or yielding qualities of the feed rolls themselves. The claims call for a pair of feed rolls or a feed roll on each of the shafts. True, the specification gives a preferred form, but a person who should duplicate the machine described in the patent with the substitution of a pair of solid wooden or metal feed rolls would infringe. Leave out the "yielding means for forcing said feed rolls against said tube" or "toward each other," or "yielding mechanism for drawing said frames toward each other," or "a resilient connection between the two frames whereby the frames are drawn towards each other"—that is, use neither the one nor the other, nor a mechanical equivalent—and there can be no infringement. Feed rolls, the peripheries of which enlarge and contract, are not "yielding means for forcing said feed rolls against said tube" or "toward each other" or "yielding mechanism for drawing said frames towards each other," or "a resilient connection between the two frames whereby the frames are drawn towards each other." Enlarging the peripheries of the rolls does not force the feed rolls against the tube. It simply brings the peripheries in contact therewith. That is not the spirit or idea of the patent. That is not the improvement patented or described or claimed, nor is such a mechanism the mechanical equivalent of the one described and patented. "Where the claim is fairly susceptible of two constructions, that one will be adopted which will preserve to the patentee his actual invention; but nothing can be held to be an infringement of a patent which does not fall within the terms the patentee has himself chosen to express his invention." McClain v. Ortmayer, 141 U. S. 419, 12 Sup. Ct. 76, 35 L. Ed. 800. "To constitute identity of invention and therefore infringement, not only must the result obtained be the same, but, in case of a combination of known elements, the elements combined must be the same and combined in the same way, so that each element shall perform the same function, and differences alleged which are merely colorable, according to the rule forbidding the use of known equivalents, will not destroy the identity." Electric Ry. Sig. Co. v. Hall Ry. Sig. Co., 114 U. S. 87, 5 Sup. Ct. 1069, 29 L. Ed. 96.

### The Jordan Machine.

In defendant's machine, the Jordan machine, covered by United States letters patent No. 960, 227 of May 31, 1910, we have no yielding connection whatever between the two upright frames carrying the shafts, which, in turn, carry the feed rolls or the shafts themselves, unless it be the above-mentioned rigid bar screw threaded as mentioned, and which is the only means for moving the two upright frames and consequently the two feed rolls either toward or away from the tube or roller. These frames and shafts are not constructed of flexible

or resilient materials (in the sense of the patent, all steel being somewhat resilient) which bend or move back and forth.

## Feed Rolls.

The feed rolls themselves differ in construction from those shown in the Palmer patent. While they are mounted on their respective shafts, each has within it a spring which allows a giving or yielding of the strips of leather or other flexible material which cover or reach from side to side of the open interior of such feed rolls, when brought in contact with and pressed against the tube and fabric thereon. That is, this spring in the interior of the feed roll allows the said strips on the feed roll to yield and give when pressed against the fabric on the tube. There is, as stated, no yielding of the frames or of the shafts.

The feed rolls of the patent in suit are thus described:

"The feed rolls, 3, are preferably formed with a concaved periphery, 14, across the hollow or groove formed by which are secured strips, 15, of leather or other flexible material adapted to bear upon the engaged fabric with sufficient friction to properly feed the same but without injury thereto."

The purpose of the flexible strips placed a short distance apart is evident enough. Spaced apart, the strips form a sort of corrugated surface to the periphery of the feed roll, so it will the more readily grasp and push along the fabric. Flexible, they yield to extra pressure, and, being elastic in a degree, they regain their normal position when the extra pressure is removed. To my mind the insertion of the spring into the feed roller in no way answers to the spirit or real purpose of the Palmer patent. It is simply an extension of the principle of the feed rolls of the prior art and an improvement on the feed rolls of the Palmer patent. These springs in no way tend to move the frames or shafts carried thereby, and on which the feed rolls are mounted, either toward or away from each other so as to force the feed rolls against opposite sides of the tube supporting and carrying the fabric. They do not move the feed rolls, or tend to do so, toward the tube carrying fabric. They do allow a contraction of the peripheries of the feed rolls.

## Palmer's Idea.

Palmer's idea and invention was to provide two swinging frames, each carrying a rigid shaft, which, in turn, carried a feed roll of the kind described, or any feed roll of the then existing art, and to connect these frames by a coil spring or its equivalent, normally drawing the frames toward each other, something that would yield to pressure, so that, when the feed rolls were in contact with the fabric on the tube and held there by the yielding means the feed rolls, shafts and frames would all yield to pressure in unison and move away from the fabric so as not to press the feed rolls too hard against it and wear or tear—that is, injure it—and then come back automatically into position by means of the contraction of the spring or its equivalent when the extra pressure caused by an uneven fabric should be removed. As stated, Palmer nowhere suggests that this yielding of the feed

rolls may be done otherwise than by the yielding connection of the frames themselves. Therefore he provides the coil spring shown in his drawings, described in his specification, and claimed as we have seen.

### Jordan's Idea.

Jordan's idea was to provide two rigid swinging frames—swinging because hinged to the bed pieces—two rigid shafts carried thereby, one by each, two improved feed rolls carried by the said shafts, and a rigid and unyielding connection between the two frames, but screw threaded as described, so that by turning same by hand or otherwise the frames, shafts, and feed rolls, as one whole, would be moved toward or away from the tube carrying the fabric. Whenever this connecting bar ceases to turn, the frames and all carried thereby stand rigidly and unyieldingly in position. This enables Jordan to move the rolls into engagement with the fabric on the tube at a certain fixed point and hold them there, or out of engagement and to a distance, any fixed distance, so as not to interfere with the removal of the loaded tube, by turning this connecting bar the one way or the other way. This Palmer is unable to do. His yielding connection or means brings the two feed rolls as forcibly against the fabric as the spring has power to do, and, when released, the rolls go as far apart as the force applied takes them, and they are held by a brace of predetermined length. To prevent injury to the fabric, Jordan resorts to quite a different device and construction. He goes to the feed rolls themselves, and makes the interior thereof hollow. There is a plate at each end of the roll, and these are connected by a spring of somewhat peculiar construction and attachment. It is unnecessary to describe it fully. Palmer has nothing of the kind and no equivalent. These plates are connected by strips of leather or one strip interlacing or other elastic material somewhat yielding to pressure but not sufficiently so and hence the spring. Brought into contact with the fabric on the tube, when the uneven surfaces are great, too great for the strips, the extra pressure operates the springs on the interiors of the feed rolls, so there is a yielding of the leather strip or strips of each of such feed rolls and a shortening of its diameter where in contact with the enlarged part of the fabric and necessarily a reduction of pressure on the fabric at the time from what otherwise it would be. But there is no yielding of the shafts or of the frames, no movement of either away from the tube, and no movement of the feed rolls themselves away from the tube when the machine is in operation. This is an operation quite different in principle from that of the Palmer patent.

### Patent Office Action.

Neither Palmer nor Jordan was a pioneer in this art. Each was an improver on Gove, a reference in the Patent Office when the Palmer application was pending, and when all the Palmer claims which referred to "feed rolls so constructed that the peripheries will yield" were rejected and canceled. Palmer having claimed such feed rolls as the defendant now uses under the Jordan patent, and all claims therefor

having been rejected on Gove, a prior patent, No. 769,648, issued September 6, 1904, and Palmer having acquiesced in such rejection, I am unable to see how he can now contend successfully that the defendant infringes his patent by using that kind of a feed roll (improved though it may be). Gove had a patent for it. It was old in the art when Palmer applied for his patent and claimed it. Palmer's claim for it was rejected, and he acquiesced in such rejection. The examiner said in rejecting Palmer's first claims and his amended claims after inserting "yieldingly supported" before the words "feed rolls":

"Yieldingly supported feed rolls, d2, d3, are shown in the patent to Gove and there would be no invention in making said rolls like those disclosed in the patent to Brenon (evidently referring to Dreman, No. 682,245 of September 10, 1901); new claim 6 is rejected as showing no invention over the patent to Gove. The patent to Gove discloses yieldingly supported feed rolls, the duplication of which does not amount to invention."

Claim 1 of the Dreman patent of 1901 says and claims:

"A set of rollers to feed a strip of fabric, having a circumferential groove in the peripheral face of each, and an elastic covering bridging said groove, substantially as described."

This patent does not show the bridging elastic covering in strips, but otherwise the feed rolls are substantially like those shown by Palmer. Dreman also says:

"The face of rollers, 5, have an elastic covering, 13, preferably of rubber, which bridges grooves. 12, and provides an accommodating or yielding gripping surface by means of which strip 7 is twisted and also fed downward in its twisted form. The twisting of the strip is accomplished by rotating the support of rollers, 5," etc.

It is seen that "accommodating or yielding" gripping peripheries in feed rolls were old. Dreman fed in strips of fabric (and twisted them by other means), and then fed them along with these feed rolls having the yielding peripheries of elastic material which bridged the groove or hollow space in the roller itself. Mr. Gooding, complainant's expert, contends that the iron bearing frames of defendant are light in construction and below the feed rolls, and spring and yield so as to form an equivalent for the spring. This is not supported by the evidence or by the machine itself. The frames and construction are made more rigid than those of Palmer. An inspection of the screw threaded shaft of Jordan shows it to be rigid and unyielding. Mr. Cooper, defendant's expert, differs from Mr. Gooding widely, but it is not necessary to quote his evidence. I think the evidence establishes that Gove made operative machines, and had them in operation more than two years prior to the time Palmer applied for his patent, December 5, 1905.

## The Utica Knitting Company Machines.

[3] There are four machines in evidence before the court purchased by complainant of the Utica Knitting Company. The defendant concedes that these machines infringe the Palmer patent. They bear no resemblance to the defendant's machines we have been discussing. A glance shows that these so-called Utica machines infringe the Palmer

patent. Defendant claims it neither made, nor sold, nor used same. That is the question so far as these machines are concerned.

The defendant's first certificate of incorporation was filed December 21, 1908, and January 12, 1909, about, the certificate of subscription to stock was filed, and soon thereafter defendant commenced business. In November, 1908, prior to the incorporation of this defendant, Mr. Jordan, later president of the company, made an agreement with Mr. Gridley, acting for the Utica Knitting Company, whereby these infringing machines were, in effect, sold to the Utica Company if they proved satisfactory, and one was put in or delivered on trial at about that time, and subsequently the others were shipped and delivered. It, of course, rested with the Utica Company to determine whether or not they were satisfactory. A bill for the first machine was rendered February 13, 1909, by the defendant company as successor to C. Jordan, who made the agreement, and paid by check March 2, 1909, drawn to order of said Jordan Company and indorsed by it. Early in December, 1908, and before defendant's incorporation, there was trouble with one of the machines and some changes were made by C. Jordan. There was no later or different agreement as to a sale and purchase of these machines than that of November, 1908. In short, the company made no sale or delivery of the machines, but it did after incorporation render bills and collect the pay therefor. If these machines belonged to Jordan (they could not have belonged to the company) when the contract was made in November, 1908, and he remained the owner until finally accepted and paid for by the Utica company, the Jordan Machine Company did not become an infringer by merely taking over the account, rendering bills, and collecting the pay. If, however, the Jordan Company became the owner of the machines and was the owner when actually purchased by the Utica Company, then the Jordan Company became an infringer in selling them. It must be true that, if A. makes and agrees to sell an infringing machine to B., and later sells his business, property and contracts to C., and C. assumes and performs them and consummates the sale of the infringing machine, he becomes an infringer even if he knew nothing of the infringing character of the machine.

The machines, it is claimed, never came into the possession or under the control of the Jordan Company. There was no agreement or conversation or correspondence on the subject of sale or acceptance between the two companies. The bills were rendered by the Jordan Company and paid by the Utica Company, but Jordan was doing business as the Jordan Machine Company before the corporation was organized and got the check himself in payment at the Utica mills. How did this come about, and what was the transaction or what were the transactions? Jordan says:

"Mr. Gridley said that if I was willing to put in a machine on trial, and prove the machine to be a success on their goods, that I could do so, and that they would buy it if it made good and they would also buy three machines for their mill No. 2. * * * I shipped and installed the machine about some time around November 20, 1908, or something like that, and I called at the mill again early in December, 1908, but I did not see Mr. Gridley at that time. I went into the mill, and looked to see if the machine was

working all right, and asked the superintendent of the No. 1 mill if the machine was giving satisfaction. He said the machine was satisfactory. * * * He said I would have to remedy this before he would O. K. the machine, so I decided to improve the arrangement on the countershaft for automatically stopping and starting the machine. Making this improvement in the countershaft and trying it out delayed me in putting in the other three machines for the No. 2 mill until February, 1909. * * * Q. 12. When were those machines completed? A. 12. Those machines were completed the latter part of November, 1908, or the first part of December. I cannot say just which. * * * Q. 16. Did you transfer to the corporation the accounts due from the Utica Knitting Company to yourself or thereafter to become due for those four machines? A. 16. I transferred all accounts due me to the Jordan Machine Company upon its incorporation. Those accounts included the machines sold to the Utica Knitting Company."

In relation to a guaranty regarding infringement signed by him as president, given later, he says:

"My reason for signing my name as president of the Jordan Machine Company was that I considered it would have more weight with the manufacturers by doing it in that way."

He denies that he had authority from the company to do any such thing. He also testifies that, before the company was organized, he carried on the business under the name "Jordan Machine Company." As this was the fact, there is no significance in the use of that name alone by Jordan even after the organization of the company if confined to some business of his own not transferred to that company. On this subject Jordan said:

"XQ. 85. Did you turn over to the Jordan Machine Company the defendant in this suit all your interest in this business at or about the time of the incorporation of the company? A. Yes. XQ. 86. So that, after you had turned over your interest in this business, you owned nothing personally in connection with this business of manufacturing turning machines which you had previously carried on. That is what I understand you to mean? * * * A. Yes. * * * (Ans. to XQ. 88.) I transferred all parts and incompleted machines. I had some machines which I had orders to send out on approval for which I turned over the accounts. XQ. 89. Did you keep for yourself any completed machines, incomplete machines or parts of machines? A. I did not."

Mr. Jordan repeatedly says that these completed machines were not transferred to the defendant corporation. Mr. Wertime, an officer of the company and an attorney at law, who prepared the incorporation papers and attended to the transfer of the property says the corporation commenced to do business about February 1, 1909, and that Mr. Jordan stated the property that was to be transferred to the company, and that later he drew a bill of sale, and that neither the statement nor bill of sale included any manufactured, completed, machines, and that Mr. Jordan did transfer an account against the Utica Knitting Company.

[4] Prior to March 9, 1909, the complainant commenced sending out letters to the purchasers and users of the Jordan machines alleging infringement, and, in effect, threatening suits. Mr. Jordan, then president of the defendant corporation, sent to such purchasers and users, in some cases at least, and to the Utica Knitting Company, a guaranty letter dated March 9, 1909, signed, "Jordan Machine Co.,

by Cornelius Jordan, President," to which reference has been made, stating:

"In consideration of the purchase by the Utica Knitting Company from Jordan Machine Co. of four (4) pipe loading machines the said Jordan Machine Co. guarantees that said machine is covered by an application for letters patent made to the Patent Office of the United States and also guarantees that the same is not an infringement upon any other patent or patents granted by the Patent Office of the United States government," etc.

This letter was not sent to the complainants, and is not an admission upon which they can rely as an estoppel. This letter purports to be written and was written by the president and manager of the defendant corporation, and the use of the words "said Jordan Machine Co." makes it an admission that said four machines were purchased by the Utica Company of the Jordan Company corporation. This, however, sent for the purpose of quieting the Utica Company and getting pay for the machines, does not change the actual facts, or estop the defendant company from proving them as a defense to this action by the Palmers. The complainants here can use that admission as evidence that the defendant corporation did sell the four machines, but it does not between these litigants establish that as a fact if the proven facts show the truth to be otherwise. As between the Utica Company and the defendant company in a suit upon the guaranty, the admission would be conclusive. The defendant would be estopped to deny its truth in the absence of fraud. If Jordan and Wertime tell the truth, Jordan, doing business under the name of Jordan Machine Company, sold these machines to the Utica Company, even if title did not pass until paid for in March, 1909, and the defendant corporation had nothing to do with their manufacture, construction, or sale, as Jordan never sold them to the defendant corporation. If the Utica Company had finally refused to accept them, and had returned them, they would have been the property of Cornelius Jordan, not of the Jordan Machine Company, defendant, although subject in equity, possibly to an equitable lien. But they did not come back, and the defendant company did nothing except to receive the pay therefor under its assignment of the account. Under such a state of facts, it would be unjust and inequitable to charge the defendant corporation as an infringer. It is evident that Jordan did not intend to sell or transfer these machines to the Jordan Machine Company incorporated, and that such corporation did not intend to purchase them.

[7] To constitute a sale by agreement, there must be an intent to sell and an intent to purchase, a purpose to pass title. If A. delivers a horse to B. on contract that B. is to try him and keep him if satisfactory and pay $200 therefor, and A. then sells the account or demand for the $200 to C., and B. concludes not to accept the horse, and so returns him, who owns the horse, A. or C.? So, if B. keeps the horse 10 days before making up his mind, does the ownership of the horse pass to C. during that time? As between A. and B., the title to the horse may not have passed, but, as between A., B., and C., the title is either in A. or B., not in C. Whatever the relationship between the Utica Company and Jordan as to these machines, the Jordan Machine Company, incorporated the defendant here, never made or used or sold

these machines or took part in so doing. Jordan sold other machines of the same construction as these Utica Knitting Company machines before the corporation commenced business and assigned the accounts, money due, or to become due therefor to the corporation, but he did not sell the machines or any interest therein to the defendant company, and the defendant corporation had nothing to do with the making, using, or selling. No doubt Cornelius Jordan was an infringer in making and selling machines such as were sold the Utica Company, including those, but his sins in this regard cannot justly be loaded on the defendant corporation of which he became stockholder and president. I cannot find that the defendant company took any part in the infringement.

As infringement by the defendant corporation is not made out, there will be a decree dismissing the bill, with costs.