### TRUSSED CONCRETE STEEL CO. v. CORRUGATED BAR CO.

(District Court, W. D. New York. September 8, 1913. On Rehearing, March 10, 1914.)

1. PATENTS (§ 129*)—SUIT FOR INFRINGEMENT—ESTOPPEL TO DENY VALIDITY OF PATENT.

Knowledge by a corporation of the ownership of a patent by an assignee of the patentee is not alone sufficient to estop it from contracting with such patentee for the use of a later improvement made by him, or for his services, or from denying the validity or narrowing the scope of the earlier patent when sued for its infringement by an article made by it under a patent to another.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 182½–186; Dec. Dig. § 129.*]

2. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT.

The Forsyth patent, No. 862,897, for a process of making expanded sheet metal and for the product is of narrow scope and as so construed, *held* not infringed.

In Equity. Suit by the Trussed Concrete Steel Company against the Corrugated Bar Company. On final hearing, and on rehearing. Decree for defendant.

Chappell & Earl, Fred L. Chappell, and Merle Smith, all of Kalamazoo, Mich., for complainant.

James A. Carr, of St. Louis, Mo., and Kenefick, Cooke, Mitchell & Bass, of Buffalo, N. Y., for defendant.

HAZEL, District Judge. Suit has been brought on patent No. 862,-897, for expanded metal, granted August 13, 1907, to William D. Forsyth, assignee to the complainant, the Trussed Concrete Steel Company, and the bill alleges that the defendant, the Corrugated Bar Company, has infringed the claims for process and product which read as follows:

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

"(3) The process of forming expanded metal which consists in slitting the same along longitudinal lines so as to form parallel bands connected by tongues split through their bases, and expanding the material.

"(4) An expanded metal comprising a series of longitudinal members, and a series of ties connecting the same, each tie formed of two parts connected at a line midway between the main tension members, all the members being integral."

"(6) An expanded metal comprising longitudinal members, and a series of ties between adjacent longitudinal members, each tie formed of two parts united at their ends."

The character of the product and the process for producing the same sufficiently appear from the wording of the claims quoted. The expanded sheet metal produced by the complainant, in which the outer longitudinal rib is extended beyond the surface of the sheet, an element not claimed or described in complainant's patent, was known commercially as "Hy-Rib," and was ordinarily used as a substitute for wooden lathing in the construction of houses or partitions. The defendant company initiated negotiations with Forsyth, the patentee herein, for the development of an improvement in sheet metal designed for such uses and for reinforcing concrete, and subsequently engaged in the manufacture of such commodity giving to it the arbitrary trade-name of "Corr-Mesh."

It was alleged that the defendant company infringed complainant's copyrighted advertising catalogue previously circulated to the trade, but this feature of the bill has been withdrawn, except in so far as the evidence relating thereto is claimed to aggravate the asserted infringement of the patent which is the subject of this action.

The defendant in its answer alleges anticipation, lack of invention, noninfringement, double patenting, and that its product is produced under the invention of one Dwight G. Clark. Infringement is based mainly upon the claim that the defendant company, having knowledge of complainant's ownership of Forsyth patent, No. 862,897, conspired with the patentee to infringe such patent, particularly the claims in controversy, and that therefore it is estopped from disputing their validity.

The evidence shows that Mr. Johnson, the vice president of the defendant company, first met Forsyth in December, 1910, the interview having been arranged by one of defendant's employés formerly in the employ of the complainant, who was acquainted with the patentee. From correspondence between Forsyth and the defendant it is evident that the former contemplated making an improvement in expanded metal which the defendant designed to exploit. Negotiations were entered into which ripened into an agreement under which Forsyth, for value, bound himself to make sheets of expanded metal in accordance with certain specifications accompanying applications for patents. The material recitals in the agreement were that, if after test sheets of expanded metal were made and delivered to the defendant, the latter elected to build machinery for making such product, Forsyth was to assist in the designing and construction thereof, the actual work of construction to be performed by engineers selected by the defendant. Reference was made therein to a license agreement held in escrow,

giving the defendant company the exclusive right, under various applications for patents, to make and use machinery and to practice the process for the manufacture of expanded metal. There were other provisions relating to the payment of expenses of any litigation carried on by the defendant for infringement of the patents and giving authority to defend any infringement suits that might be brought against it and to deduct from the royalties accruing to Forsyth an amount equaling the amount paid for such defense.

It is shown that there was an interference proceeding declared in the Patent Office between Clark and Forsyth which, however, was not prosecuted by Clark, whose application for patent was of earlier date, and who had meanwhile assigned his invention to one Neeper, attorney for both the defendant and Forsyth. An agreement was made, in which the defendant joined, by which Clark was to receive certain royalties, or an amount in extinguishment of royalties, on all products manufactured under the Clark invention to be paid from the royalties which the defendant had previously agreed to pay Forsyth.

[1] It is contended that the contractual relations by which Forsyth was to receive royalties, his apparent interest in procuring the trademark Corr-Mesh on defendant's material, and the agreement by which the Clark invention was assigned are evidential circumstances showing the intention on the part of defendant to produce expanded metal of a type equivalent to that described in Forsyth patent, No. 862,897, in controversy; and that, notwithstanding that defendant's product may be the result of the Dwight G. Clark invention, the principle of estoppel is applicable. But with this contention I do not agree. Existence, alone, of knowledge by the defendant of the ownership by complainant corporation of earlier Forsyth patents would be entirely insufficient to estop the defendant from making use of an improvement by the same inventor. Forsyth did not create the defendant company, nor was he the manager or controller of its affairs. He was not a stockholder, nor was he especially interested in its business future, except in so far as the royalties to be received by him for the use of his later inventions for expanded metal were concerned. Assuming its relevancy, the exhibit correspondence indicates that he claimed to have invented a patentable improvement, a new high rib, so called, and that the defendant, placing reliance on his assertions, engaged his services at an agreed compensation to assist in designing or making a machine to produce his improved expanded metal, which he later described in his application for patent.

[2] It is well settled that the doctrine of equitable estoppel, as applied to a corporation, arises, as said in Babcock & Wilcox Co. v. Toledo Boiler Co., 170 Fed. 81, 95 C. C. A. 363, from "some corporate act or relation of privity of estate or interest under or with one who is estopped." It is not here claimed that the defendant company had any information regarding the extent of Forsyth's option agreements with the complainant company by which the latter was to become owner of his earlier patents for expanded metal and any subsequent improvements, and which agreements were the subject of litigation between him and the complainant before Judge Day of the Eastern Dis-

trict of Ohio. The evidence in its entirety indicates that the defendant believed that a patentable improvement over his earlier patents had been made by Forsyth, which he had the legal right to assign. If Forsyth, after assigning the patent in suit, made an improvement, he had the right, unless precluded by his agreement, if sued by complainant for infringement, to invoke the prior art to limit the scope of his assigned patent, to sustain his claim of noninfringement. Babcock v. Clarkson, 63 Fed. 607, 11 C. C. A. 351; Noonan v. Chester Park Athletic Club Co., 99 Fed. 90, 39 C. C. A. 426; Western Telephone Const. Co. v. Stromberg et al. (C. C.) 66 Fed. 550. While in this case there may be circumstances which perhaps are fraught with suspicion, yet they are of insufficient strength to support the claim of privity of estoppel with Forsyth, as the creation merely of an inference or intendment is not enough. Indeed, it is judicially held that the facts upon which an estoppel is predicated must be shown with particularity and precision, for fraud cannot be imputed when the acts and conduct of a defendant, against whom estoppel is invoked, are as equally consistent with innocence as with guilt.

The complainant also urges that, notwithstanding defendant's conceded production under the Clark patent, the presumption of privity between Forsyth and the defendant is sufficiently strong to estop the latter from proving the invalidity of the Forsyth patent which he had transferred to complainant, first, because of his services in assisting in the manufacture of diamond mesh machinery; and, second, because of his efforts, or the efforts of his attorney, in procuring the assignment to defendant of the Clark application. But I think this would carry the doctrine of estoppel much farther than it is carried in any reported case to which my attention is directed. In Woodward et al. v. Boston Lasting Mach. Co., 60 Fed. 283, 8 C. C. A. 622, the doctrine was invoked against a patentee, who had previously assigned his patent, and his associates. But in the case at bar, as said, the defendant does not manufacture its product under any improvement of complainant's assignor. Such was perhaps the intention, but the acquirement of the Clark invention by defendant, even though it was in consequence of efforts of Forsyth, does not deprive the defendant of the right to prove that complainant's patent is invalid or its scope so narrow as to exclude the defendant's process and product.

The defendant disclaims any rights under its escrow license agreement with Forsyth. The evidence shows that the experiments made under the Forsyth improvements were unsuccessful; Forsyth swearing that he received no royalties under the license agreement which, indeed, he considered abandoned.

It is unnecessary, in my view of this controversy, to pass upon the defense of double patenting, and I therefore proceed to consider the complainant's patent in suit, assigned to it by Forsyth, and the specification and claims as bearing upon the questions of validity and infringement.

The string-tie and diamond-mesh types of expanded metal were well understood by the skilled in the art at the date of the conception in suit, and to slit flat metal in different ways on longitudinal

and transverse lines and to expand it were not new expedients. Metal of different thicknesses had previously been variously cut or slitted for use as lathing, in reinforcing concrete, and for scroll work. In expanding or stretching sheet metal which was to be employed for lathing or in connection with other building construction, it was important to obtain a certain amount of stiffening in the mesh or lattice portions. Prior patents had been granted by the Patent Office for improvements which decreased the flexibility of the expanded metal, stiffened it, and held more firmly in place the material in which it was imbedded. The patent to C. B. White, No. 668,668, is of this character; the metal being stiffened by corrugating it and then slitting it parallel to the corrugations. In the Kahn patents in evidence, the metal, which was much heavier than sheet metal, was slit longitudinally and transversely, and the slitted portions then struck up so as to extend above the surface of the metal, but the single object of the patentee therein was to expand metal for use in reinforcing trusses for buildings, and its use as lathing was not in his mind. Though importance is attached by the defendant to the Kahn patents, I am unwilling to deny the novelty of the claims in suit upon their reference or upon references of a similar character, although, from the knowledge gained in making trusses for building construction, there no doubt originated the idea of adapting expanded sheet metal for lathing and for reinforcing concrete.

The new element introduced by the patentee in his combination was the connection of each cross-tie at its ends to longitudinal members or ribs; each tie being of two parts and having tongues folded up on their central lines until they come together. If I am correct in believing that to connect parallel rows of string ties to longitudinal ribs was a feature of the prior art, then claims 4 and 6 must be limited to the form described in the specification and drawings.

The complainant places stress upon slitting the sheet metal in a characteristic way to form longitudinal members and cross-ties or tongues slit through their bases, but in the Fugman patent, No. 634,-237, dated October 3, 1899, for sheeting used in building, there are shown unslitted longitudinal members which are separated by slitted ties, the slits, it is true, extending diagonally from the longitudinal member to permit vertical expansion of the sheet; but there is very little difference between this method of expanding the cut portion and the lateral expansion of the patent in suit.

The Wylie patent, No. 533,260, responds to claims 4 and 6 in suit more nearly than any other reference. The patent is for expanded metal lath of the string-tie variety, in which series of string ties are separately connected to unslitted portions of the metal; i. e., longitudinal members. Tongues are formed in the middle of the ties which are slit through at their bases, but, as there are two tongues to each tie, complainant's expert witness adopts the view that the particular tongues of the patent in suit are not disclosed. In spite of the differences in slitting the metal or configuring the ties and tongues, the Wylie patent bears upon the scope of the claims in controversy, and the mere fact that the tongues therein are made double and the slits

crudely cut, producing a ragged appearance, does not lessen the significance of the reference.

In the German patent to Hanson, No. 167,088, which, though not for lathing, is yet an important reference, a process of slitting or bending metal and expanding it is distinctly described, and I have no doubt that such process is adaptable to the making of metal lathing with corrugations and extensions or projections to hold the plaster in place. Defendant's Exhibit No. 5 conforms quite closely to the Hanson description and definitely shows longitudinal bars which have connected thereto cross-ties with tongues slit at their bases, as specified in claims 4 and 6 in suit; but as such patent has special reference to electrical contact pieces, and as there is doubt in my mind as to whether it sufficiently indicates the means for separating the metal and joining the longitudinal members, I therefore do not consider it absolutely anticipatory, but it is clear that, by a slight modification, it would operate substantially the same as complainant's structure. The British patent to Stimson also shows a method of slitting sheet metal along longitudinal and cross lines (see Figs. 9, 10, and 11), and that such patent is not for lathing is not of material importance. The Herringbone and Trussit lath, so called, were made from the descriptions in the Hilton, Gibson, and White patents, Nos. 651,-643 and 670,827, and show a form of diagonal slitting and longitudinal ribbing of metal; the method of expansion, however, being different from complainant's. The importance of these structures should not be underestimated, for they show string ties connected at their ends to ribs extending lengthwise of the metal. Whether or not a skilled mechanic could readily alter the Trussit and Herringbone structures by extending the slits to meet and so include the two-part feature of complainant's ties is perhaps questionable, but it certainly seems that such modification would not require a high degree of inventive faculty.

There are a number of other prior patents in evidence, but it would serve no useful purpose to refer to them in detail. The involved claims barely escape anticipation by the aforesaid references, and a narrow construction only is their due.

The type of sheet metal mesh used by the defendant was first described in the John F. Golding patent, No. 297,382, which was involved in litigation in the case of Expanded Metal Co. v. Board of Education, 111 Fed. 395, 49 C. C. A. 406, while a similar method of expanding metal is described in Bradford v. Expanded Metal Co., 146 Fed. 984, 77 C. C. A. 230. Moreover, a diamond mesh with bands of mesh work separated by uncut ribs, known as "Self-Sentering," was in existence at the time the patent in suit was granted. While the particular cross-slitting of the metal to separate full diamond meshes at their ends is different from anything contained in the prior art, so also is a different result accomplished by the transverse slitting feature of complainant's device from that accomplished in defendant's form of mesh. By its adaptation, the patentee was enabled to attach the string tie to the longitudinal member. Such cross-slitting, or form of cross-slitting, in this type of mesh is found in

the patents to Gibson, Wylie, Hilton, and others. That the resultant of the slitting of the diamond meshes by the defendant operates as an apparent duplication of complainant's device when the string ties or tongues are not fully expanded is entirely immaterial.

In my view of the patent under consideration and the evidence in relation thereto, the principal object of the patentee was to stiffen his expanded sheet metal, to accomplish which he formed parallel bands, connected by tongues slit through their bases, and, after striking up the tongues, pulled the metal laterally far enough to fold up the tongues in the metal of the tie until they came together. Indeed, the specification, after describing the manner of forming the upstanding tongues with their bent over portions, says:

"After the sheet has been formed, the outer longitudinal ribs 6 are pulled from each other, which will cause all the tongues to open along the slots 3, and the portions 7 of the tongue will fold up on their central lines until they approach each other, and the side portions 8 will bend at the lines 9 until the parts 8 of each rib assume the positions indicated in Fig. 7."

The resultant of this method of operation is that longitudinal members are formed which are connected by a row of ties and tongues; the latter having their outer ends bent at right angles and united to the longitudinal members. The securing of a greater transverse strength was the achievement, and the specification stating that the side portions of each rib 8 are "at right angles to the longitudinal member 6," as shown in the drawings (Figs. 5 and 6), emphasizes this view and indicates the distinction the patentee designed to make between his earlier patent, No. 855,240, and the patent in suit.

While claims 4 and 6 should perhaps not be restricted to expanding the tie members to the extreme, yet I am reasonably clear, in view of the prior art, that claim 4 should be limited to a construction connecting the tie members at their ends to the longitudinal members, each tie having two parts "connected at a line midway between the main tension members," and, unless the broad claim 6 is limited to two-part ties united at the ends to longitudinal members, it would be anticipated by the patents to Wylie, Fugman, and Simpson which are capable of producing substantially the same result.

Claim 3 for the process must be considered in connection with the various steps in the formation of the patentee's product. That is, the sheet metal must not only be slitted, but the tongues struck up and the tips bent and then expanded. While the process claim is expressed in broad terms, it nevertheless, in view of the prior state of the art, is of limited scope. To justify holding that the defendant's process or method of operation is an infringement of complainant's, all the essential steps by which the latter produces the result must be employed either directly or by equivalency.

The essential differences between such processes may be described thus: In defendant's process the metal is slitted from a point in the metal between spaces leaving uncut portions in the sheet and is then stretched in continuous rows of open meshes, while the slitting is arranged in series with the ends of each slit alined in each row. In complainant's process, parts of the sheet metal are left unslitted to

form longitudinal members extending the full length thereof, and the ends, after being slitted, are offset sidewise from each other with respect to the line of the series. The resultant of defendant's operation is a series of reticulations similar to the product of the Golding, Hayes, and Rapp patents, and the Exhibit "Self-Sentering," save that the tops of the meshes are slitted to separate rows from adjacent rows, while, in the string-tie type of metal, the ties are arranged in succession and attached to the unslitted portions of the sheet which are the longitudinal members of complainant's patent.

In accordance with the foregoing views, I am of the opinion that the claims relied upon are not for a primary invention, but are specific improvements on the prior art, and, as the defendant's structures are materially differentiated as to process and product, the bill must be dismissed, with costs.

## On Rehearing.

I have examined the record and the voluminous briefs submitted by the complainant, as well as the multitudinous metallic and paper models and comparative sketches, but I am disinclined to change or vary the views expressed in my former opinion. The rehearing was granted principally because no mention was made therein of claim 1, which complainant contends was also infringed by defendant's process. Claim 3, however, which is basic, was sufficiently discussed and held, in view of the prior art, to be of limited scope. It was stated in the former opinion that:

"To justify holding that the defendant's process or method of operation is an infringement of complainant's, all the essential steps by which the latter produces the result must be employed either directly or by equivalency."

Now claim 1 particularizes the process and emphasizes the feature of "striking up the tongues and bending the unsplit portion of the same back parallel to the main sheet." It is shown that the defendant does not form a tongue or projection in its expanded metal; certainly there is no such tongue tip as that described in complainant's specification, one that is struck up and projects into the general plane of the sheet, nor does the defendant in its process bend the unsplit portion back parallel to the main sheet, and for this reason I think that the defendant's product cannot be produced by the adaptation of the process described in claim 1.

Much is said by the complainant on the subject of estoppel, but, as heretofore stated, no such facts are thought disclosed by the record as to induce the holding that the defendant was so intimately associated with Forsyth as to justify the application of that doctrine. It is unnecessary to advert to defendant's evidence indicating its belief that Forsyth had made a patentable improvement over his prior patents owned by the complainant, and one which it believed he had the right to assign. It was concededly unknown to the defendant that Forsyth had agreed to assign to the Trussed Concrete Steel Company all his future improvements in expanded metal, and the evidence in its entirety falls short of showing that the defendant in-

duced him to break his contract. For this reason the adjudications cited on this point by the complainant are inapposite.

In answer to the argument that the oral testimony of Forsyth and other witnesses for defendant, tending to show that the machinery which was used by the defendant was in fact designed by the Bliss Company and that Forsyth's design was abandoned, is contradicted by the option agreement and escrow arrangement, it is only necessary to state that such prior arrangements were evidently subsequently modified, if not wholly abandoned, and that therefore controlling weight cannot be accorded to the documents in evidence.

The complainant further insists that, as Judge Day has heretofore decided, in an action by this complainant against Forsyth, that the latter infringed the Forsyth patent in suit in assisting to produce defendant's machine, this court should accord to such decision full faith and credit; but in answer to this contention it is enough to repeat that, unless the defendant was in privity with Forsyth or in any way induced him to break his contract with the complainant, the decision has no important bearing upon it. The burden of proof was upon the complainant to establish the privity of the defendant with Forsyth, but in this I think it has failed. It is quite true that it appears that, when Forsyth's application for a patent came into interference with the Clark application, he consented that his lawyer procure such patent by purchase for the defendant company; but, in view of defendant's belief that the Forsyth improvement and the Clark improvement were patentably different from complainant's construction, I do not think that defendant should be estopped from invoking the prior art to sustain its claim of noninfringement. This view entertained by me may be erroneous, but I am not so persuaded by anything appearing on the reargument.

It is unnecessary to dwell further upon the various matters contained in complainant's briefs or upon the wrongful acts of the Patent Office in failing to follow the decisions rendered in the case of this complainant against Forsyth, or to point out with greater particularity the differences in the products or articles under discussion. In my former opinion I endeavored to make clear that the improvements were of exceedingly narrow compass; that the art was divided into two types, the string-tie type and the diamond-mesh type of cutting and slitting metal; that the complainant's production was of the former type, while that of the defendant was of the latter; that the complainant's patent was not for such an improvement as would warrant including within its scope the process and product of the defendant. I am still of this opinion, and therefore, for the reasons stated, a decree may be entered for the defendant dismissing the bill.