## MARTIN GAUGE CO. v. POLLOCK et al.

### (District Court, N. D. Illinois, E. D. April 24, 1918.)

### No. 905.

1. PATENTS ☞129—SUIT FOR INFRINGEMENT—ESTOPPEL TO DENY VALIDITY.

If the assignor of a patent, estopped to deny its validity, procures a third person to furnish money to make and sell an infringing device, or a corporation is organized for that purpose, such third person or corporation is bound by the estoppel.

2. PATENTS ☞129—SUIT FOR INFRINGEMENT—EFFECT OF ESTOPPEL TO DENY VALIDITY.

In an infringement suit against an assignor and his privies, who are estopped to deny validity of the patent, the claims are given their prima facie scope, and evidence of the prior art is admissible only to explain any ambiguity in their language.

3. PATENTS ☞328—INFRINGEMENT—TIRE PRESSURE GAUGE.

Pollock patent, No. 1,220,272, for an automobile tire pressure gauge, *held* infringed.

4. PATENTS ☞129—SUIT FOR INFRINGEMENT—WAIVER OF ESTOPPEL.

Effect of the estoppel of defendants in an infringement suit to deny validity of the patent is not waived by complainant, by introducing other patents as bearing on the question of infringement, where waiver is expressly disclaimed.

In Equity. Suit by the Martin Gauge Company against Albert E. Pollock, the Protex Manufacturing Company, and Charles Friedlander & Co. On final hearing. Decree for complainant.

Lynn A. Williams, Geo. S. Pines, Robert M. See, and Edward Rector, all of Chicago, Ill., for plaintiff.

Frank H. Drury, Jones, Addington, Ames & Seibold, and Walter Hamilton, all of Chicago, Ill., for defendants.

SANBORN, District Judge. Infringement suit on a patent for an automobile tire pressure gauge, invented by the defendant Pollock. On September 18, 1916, Pollock verified his application for the patent in suit, and on the same day made a written assignment thereof to a corporation known as Firex Manufacturing Company, and in the assignment requested that the patent be issued to the corporation as his assignee. The patent application was filed October 2, 1916, and the patent issued to the corporation, as requested, March 27, 1917. On March 29, 1917, the Firex Company assigned the patent to the plaintiff, which brought this suit June 23, 1917.

Plaintiff's gauge is made under Pollock patent, No. 1,220,272, and defendant's under Pollock patent, No. 1,219,865. They may be called the Martin gauge and the Protex gauge. The former was applied for October 2, 1916, and issued March 27, 1917, and the latter applied for February 19, 1917, and issued March 20, 1917. The two are very much alike. They are made of brass tubing, with a short piston at the bottom attached to a long compression spring extending the whole length of the tube. When air from the tire valve is ad-

mitted to the bottom of the tube, the piston is pushed up against the compression of the spring. In plaintiff's gauge an indicator is also pushed up at the same time, bearing an indicator point running in a longitudinal slot to register with figures on the outside of the tube, in order to indicate the number of pounds of air pressure. In the Protex, the figures are placed on a tubular shell, sliding just inside the outer tubing and outside the spring. This shell slides up with the pressure, and the proper figure shows through a window or slot in the outer tube. This is the only important difference between the gauges. The two forms of indicating device are most palpable equivalents. In one, a pointer moves over a scale; in the other, a series of numbers are made to appear successively at a slot or window. The two forms have always been interchangeably used on spring scales known to every one.

The controversies in this case turn mainly on the relation of the defendant Pollock with the parties on both sides of the case. The plaintiff, Martin Gauge Company, is a legal form under which Charles Cohn and Michael Gidwitz own the Pollock-Martin patent in suit. Another corporation, called the Firex Manufacturing Company, represented the business of making and selling fire extinguishers, which business was brought to them by Pollock, and operated by the three of them for a few months, when it proved unsuccessful. The main business of Cohn and Gidwitz is in connection with a corporation known as the Lanzit Corrugated Box Company. Pollock went to Cohn and Gidwitz with the fire extinguisher, because they were able to furnish the money to start the business.

The claims made by plaintiff are that Pollock, having sold and assigned the Martin patent in suit to the Firex Company, to which plaintiff has succeeded in title, is estopped to deny the validity and prima facie scope of the patent by the rule of this circuit announced in Siemens-Halske El. Co. v. Duncan El. Co., 142 Fed. 157, 73 C. C. A. 375. Then it is further claimed that the estoppel also extends to all the other defendants, because it is alleged the proof shows that they went into the business of infringing the patent after having derived from him their knowledge of the infringing device, and having availed themselves of his knowledge and assistance.

The relations between Pollock and Cohn and Gidwitz, prior to his getting them interested in the tire gauge business, are only important to show the consideration for his transfer of the patent. Pollock having brought them the fire extinguisher business in the spring of 1916, and the Firex Company having been organized to represent that business, in which Pollock held 12 of the 25 shares, and the extinguisher business not proving successful, Pollock brought to their notice, on September 18, 1916, his invention of the tire gauge. Cohn and Gidwitz submitted the matter to a patent lawyer, and were advised by him that a patent taken out on the device would be valid, and would not infringe the Twitchell gauge then on the market. Thereupon it was agreed between Pollock and Cohn and Gidwitz that the latter would furnish the money to make and sell the device, and for taking out a patent, and continue to Pollock the payment of $40 a week

which he had been receiving in the fire extinguisher business; also, if a new corporation should be formed to represent the gauge business, Pollock was to have a full half of the corporate stock. Pollock on his part agreed to assign the patent application, turn over certain orders for gauges he had taken, and give his services to the gauge business.

The patent was accordingly applied for, and assigned to the Firex Company, and later to plaintiff, as already detailed. Dies for the gauge were procured, a large amount of brass tubing purchased, and some 50,000 orders for gauges taken. As soon as it became known that the new gauge was coming out, the owners of the Twitchell gauge threatened to bring infringement suits. Advice of patent lawyers was again taken, and their advice was the same as before. Pollock brought forward another form of gauge, the Protex gauge as now used by the defendants, and suggested that it would not infringe the Twitchell patent. He also presented a model of the new gauge, but his suggestions were not considered of any value. This new model was the same as that of the defendant's device, now claimed to infringe. No deliveries of gauges were ever made under the orders taken.

The new corporation to represent the gauge business was organized under the name of the Martin Gauge Company, January 9, 1917. It had been agreed that Pollock was to have one-half the capital, but Cohn and Gidwitz insisted that on account of the threats of infringement suits, and expense not contemplated, he should have only one-third, and he assented to this. Each of the parties subscribed for $3,333.33 of the stock (fixed at $10,000), but no certificates were ever issued. Pollock was general manager and sales agent of the gauge business, at a salary of $40 a week, until he stopped work February 17, 1917.

A point has now been reached in the narrative where the relations of Pollock to both sides of this controversy may from the evidence be clearly stated. After the organization of the Martin Gauge Company, early in January, 1917, Pollock became dissatisfied with his position, mainly because he was not getting enough wages. He says he would have been perfectly satisfied with an increase of $10 a week; but he had no legal right to demand an increase. He was manager of the Martin Company, holding a third interest in it, and if he wished to push the sales of gauges he had full power to do so. It is probably true that Cohn and Gidwitz were backward about putting up more money; but the tubing and dies were there, and Pollock had the game in his own hands.

Being dissatisfied, Pollock cast about for some new business connection, and during the last week in January he met the defendant William Friedlander and endeavored to interest him in a plan to purchase the tire gauge and extinguisher business of the Firex and Martin Companies, including the patent in suit. It was finally agreed that this should be done, and an offer was made by Friedlander to Cohn and Gidwitz to pay them what they had put into those matters. This was not accepted, and there was some talk of their asking $60,000; but Pollock did not

follow up the negotiations, or make any great effort to buy them out. He had another scheme.

In his conferences with William Friedlander late in January, and prior to the middle of February, Pollock told him about the new Protex gauge, of which he had shown Gidwitz and an attorney the model when the question of infringement came up, and it was agreed that, if they did not succeed in buying out Cohn and Gidwitz, they would organize a new company to produce the new gauge, to be sold by Charles Friedlander & Co. (who were dealers in automobile accessories), and that a patent should be taken out on the Protex gauge. Pollock was to be "taken care of" by Friedlander—that is, have a salary of $50 a week. Pollock heard that the patent application on the Martin gauge had been or was soon expected to be allowed. He therefore hurriedly prepared the application on the Protex, had it filed, his attorney went to Washington, and by application to the commissioners had the case made special, thus obtaining an immediate allowance of the application; the patent being issued within 30 days from the time of application filed. This great haste was in order to get the patent allowed quickly, so as to secure Friedlander in making his advances. As soon as the patent was issued, the defendant corporation, Protex Manufacturing Company, was organized with a paid-up capital of $5,000. This corporation expended $8,000 in putting the new Protex gauge on the market. Pollock's connection with Cohn and Gidwitz ceased on February 17, 1917, and on March 3, 1917, Friedlander paid them $371 for a release of all claims and demands they had against Pollock. This release was also intended to cover claims of the Martin Gauge Company.

[1, 2] The inference from this state of facts is perfectly obvious. If the assignor of a patent, estopped to deny its validity, agrees with a third person to furnish money to make and sell a device designed to accomplish the same purpose as, and which is an infringement of, the patented device, such third person thereby becomes bound by the estoppel; and a corporation organized for the purpose of bringing out the new device and putting it on the market, and to which a patent thereon was assigned, is likewise estopped to deny the validity of the patent. All the parties are likewise bound by the rule in the Seventh Circuit, by the prima facie scope of the patent claims, and the prior art is not admissible in evidence in a suit involving infringement, unless there is ambiguity or uncertainty in the language of the description and claims, and then only so far as necessary to explain such ambiguity. Siemens-Halske El. Co. v. Duncan El. Co., supra; Chicago & Alton Ry. Co. v. Pressed Steel Car Co., 243 Fed. 883, 156 C. C. A. 395.

Authorities bearing on the question of who are privies to the estoppel are Continental Wire Fence Co. v. Pendergast (C. C.) 126 Fed. 381; Cross Paper Feeder Co. v. United Ptg. Mach. Co. (D. C.) 220 Fed. 313; Daniel v. Miller (C. C.) 81 Fed. 1000; Mellor v. Carroll (C. C.) 141 Fed. 992; Woodward v. Boston Lasting Mach. Co., 60 Fed. 283, 8 C. C. A. 622; Roessing v. Coal & Coke By-Products Co., 208 Fed. 990, 127 C. C. A. 394; Climax Lock & Ventilator Co. v. Ajax Hardware Co. (C. C.) 192 Fed. 126; Mergenthaler Linotype Co. v. Inter-

national Typesetting Mach. Co. (D. C.) 229 Fed. 168; Onondaga Indian Wigwam Co. v. Ka-Noo-No Indian Mfg. Co. (C. C.) 182 Fed. 832; Babcock & Wilcox Co. v. Toledo Boiler Works Co., 170 Fed. 81, 95 C. C. A. 363; Macey Co. v. Globe-Wernicke Co., 180 Fed. 401, 103 C. C. A. 547 (Seventh Circuit); Trussed Concrete Steel Co. v. Corrugated Bar Co. (D. C.) 214 Fed. 393.

The new Protex gauge was the head and front of all the negotiations, arrangements, and agreements between the defendants. It was to develop its manufacture and sale that Pollock left the plaintiff, Friedlander put up the money, and the Protex Company was organized. Without it none of these things would have happened. If, therefore, the Protex gauge is an infringement of plaintiff's patent, all the defendants are liable as privies in joint acts of infringement, and all are equally bound by the estoppel of Pollock in assigning the application to the Firex Company, by which it was transferred to plaintiff.

[3] By the rule of the Siemens-Halske Case the claims are to be given their full prima facie scope. As already stated, the main difference between the two devices is the difference in the devices for marking or indicating the amount of pressure. The elements of claim 5, and corresponding elements of the Protex gauge, are as follows:

1. A tubular barrel, closed at the upper end, and an air inlet at the lower end.

2. A piston reciprocable within the barrel.

3. A spring between the piston and upper end of the barrel.

4. A tubular indicating member within the barrel, engaged by a shifting upwardly with the piston.

5. A longitudinal slot and scale-markings on the barrel, co-operating with the indicating member to show pressure.

6. A spring tongue, causing frictional engagement between the indicating member in the barrel.

1. Tubular shell, with cap, and means to establish communication between shell and tire.

2. Piston head and piston rod.

3. Coiled spring surrounding rod, between piston and cap.

4. Indicator number loosely seated on piston head, slidable within the shell, bearing a pressure indicating scale.

5. A small opening through the shell so positioned that the indicated pressure may be read.

6. A portion of the indicating member being sprung outwardly to bear against the interior of the shell to hold the member in indicating position after the gauge is removed from the tire valve.

7. Means for returning the indicating member at will.

As will readily be seen, the only material differences are in fourth and fifth elements. The figure scale of Protex is on the indicating member, instead of the barrel or shell, and the window is substituted for the longitudinal slot therein. The difference is of no importance. The scale art shows both forms indiscriminately employed. The mode of operation of the two devices is identical; but the result is recorded in a slightly different way, like the difference between writing on a slate and a shingle. Certainly the Protex gauge is within the prima facie scope of claims 5, 6, and 7 of the patent in suit. Claims 1, 2, 3, 4, and 8 call for an indicating arm or point, co-operating with the scale on the barrel to indicate the pressure. The substitute for this in the Protex is the window in the barrel or shell, which serves precisely the

same purpose as the indicator point. This indicator point also serves the same purpose as the seventh element in the Protex gauge, by which the indicating sleeve may be moved back to operative position at will. I think all the claims of the patent in suit should be held infringed.

If claims 5, 6, and 7 be criticized as inoperative, because they do not indicate any method of sliding back the tubular indicator to restore the gauge to its normal position ready to be applied to the tire valve, and that the indicator point is therefore a necessary operative part or element, the result is the same, since the additional element is supplied to these claims from the description, following the rule of Westinghouse v. Boyden Power Brake Co., 170 U. S. 537, 18 Sup. Ct. 707, 42 L. Ed. 1136.

[4] Plaintiff's counsel introduced in evidence certain patents earlier and later than the patent in suit, in order to throw some light on the question whether defendants' gauge is the equivalent of plaintiff's. This was done with an express disclaimer of any intention to waive the estoppel relied on; but it is now insisted that the introduction of prior art patents by plaintiff waived the estoppel relied on. Waiver is the intentional relinquishment of a known legal or equitable right. Lehigh Valley R. Co. v. Providence Washington Ins. Co., 172 Fed. 364, 97 C. C. A. 62. Here there was no intention to waive the estoppel, but to assist construction on the question of infringement. In Bardon v. Land & River Imp. Co., 157 U. S. 327, 334, 15 Sup. Ct. 650, 39 L. Ed. 719, plaintiff in a suit to quiet title, relying on tax deeds and special limitation laws in their support, in order to sustain contentions not involved in the question of limitation, introduced evidence which incidentally showed that the deeds were invalid for defects which the limitations would cure. It was contended that the introduction of such evidence was a waiver of the limitations, but the court held that, since the evidence was introduced for another purpose, there was no waiver.

The bill of complaint contains allegations to the effect that the Protex patent, which is the foundation of the pressure gauge business of the defendants, belongs in equity to the plaintiff, and there is a prayer for relief to that effect. I think, however, that the proofs do not show any agreement to transfer this invention, or any equity to have it transferred, so that part of the bill fails for want of equity.

There should be a decree for infringement of all claims of the Martin patent, injunction, and accounting for profits and damages, with costs. Although part of the relief prayed for is denied, this was merely incidental to the infringement claimed, and this result should not prevent the recovery of costs.