MERGENTHALER LINOTYPE CO. v. INTERNATIONAL TYPESETTING MACH. CO. (two cases).

(District Court, S. D. New York. December 28, 1914.)

Nos. 10-266, 10-311.

1. PATENTS ⬡⟜129—SUIT FOR INFRINGEMENT—ESTOPPEL TO DENY VALIDITY.
    Where a patentee, who has assigned his patent, is employed by an alleged infringer for the very purpose of designing a competing device which will, if possible, avoid infringement, there is such privity between employer and employé that, if infringement results, the employer is affected by the equitable estoppel of the employé to deny the validity of the patent, but may, like him, show the state of the prior art.
    [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 182½–186; Dec. Dig. ⬡⟜129.]

2. PATENTS ⬡⟜90—ANTICIPATION—PRIOR ART—COPENDING APPLICATIONS.
    As between two patents, the applications for which were in the Patent Office at the same time, neither is prior art as against the other, although, if they are for the same device, there may be a contest as to priority of invention, and either patentee may carry the date of invention back of the date of filing his application.
    [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 113–120; Dec. Dig. ⬡⟜90.]

3. PATENTS ⬡⟜129—SUIT FOR INFRINGEMENT—EVIDENCE—ESTOPPEL.
    A complainant is not estopped to attack a patent, when introduced by defendant as a part of the prior art, by the fact that it was one of those originally sued on, but abandoned.
    [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 182½–186; Dec. Dig. ⬡⟜129.]

4. PATENTS ⬡⟜165—CONSTRUCTION OF CLAIMS—"CLAIM IS THE MEASURE OF THE INVENTION."
    The statement in opinions that "the claim in a patent is the measure of the invention" is to be understood as applying to attempts to broaden claims beyond their language, and not as precluding a court from inquir-

⬡⟜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ing whether the claim as written is warranted by the specification, drawings, and the prior art.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 241; Dec. Dig. ⏤165.]

5. PATENTS ⏤328—VALIDITY—LINOTYPE MECHANISM.

The Cooney and Totten patent, No. 759,501, claim 11, for a magazine gate for linotype machines, *held* void, as too broad.

6. PATENTS ⏤328—VALIDITY AND INFRINGEMENT—LINOTYPE MECHANISM.

The Homans patent, No. 888,402, claim 14, for a magazine gate or matrix locking device for linotype machines, *held* not infringed.

7. PATENTS ⏤328—ANTICIPATION BY PRIOR USE—LINOTYPE MECHANISM.

The Kennedy patent, No. 586,337, claims 1 and 2, for a space-band buffer for linotype machines, *held* void for prior use of the device by others.

8. PATENTS ⏤328—VALIDITY AND INFRINGEMENT—LINOTYPE MECHANISM.

The Rogers patent, No. 619,441, for a vise jaw mechanism for linotype machines, claims 1 and 2, if valid, are narrow, and are not infringed by the device of the Homans patent, No. 1,107,758, claim 4 *held* invalid, as too broad.

9. PATENTS ⏤328—VALIDITY AND INFRINGEMENT—LINOTYPE MECHANISM.

The Champion patent, No. 719,436, and the Morehouse patent, No. 826,593, both relating to vise jaw mechanism for linotype machines, *held* not infringed.

10. PATENTS ⏤328—INVENTION—LINOTYPE MECHANISM.

The Rogers patent, No. 630,112, for a pi-stacker or sorts-holding attachment for linotype machines, *held* void for lack of invention, and also for prior use.

11. PATENTS ⏤328—VALIDITY AND INVENTION—LINOTYPE MECHANISM.

The Muelheisen patent, No. 718,781, claims 2 and 3, relating to magazine channels for linotype machines, *held* not infringed.

12. PATENTS ⏤328—INFRINGEMENT—LINOTYPE MECHANISM.

The Dodge patent, No. 797,412, claim 9, for a magazine supporting frame in linotype machines, *held* not infringed.

13. PATENTS ⏤328—INFRINGEMENT—LINOTYPE MECHANISM.

The Homans patent, No. 830,436, claim 7, for a magazine supporting frame for linotype machines, *held* infringed by the device of the Homans patent, No. 1,116,280.

14. PATENTS ⏤328—VALIDITY AND INFRINGEMENT—LINOTYPE MECHANISM.

The Kennedy patent, No. 797,436, claim 1, for a keyboard lock for linotype machines, conceding its validity, if narrowly construed, *held* not infringed.

15. PATENTS ⏤328—VALIDITY AND INFRINGEMENT—LINOTYPE MECHANISM.

The Hensley patent, No. 643,289, claims 1, 2, and 3, for a mold-resistant device for linotype machines, *held* valid and infringed.

16. PATENTS ⏤328—VALIDITY AND INFRINGEMENT—LINOTYPE MECHANISM.

The Dodge patent, No. 739,996, claims 1, 2, and 3, for a mold support for linotype machines, *held* infringed.

17. PATENTS ⏤328—INVENTION—LINOTYPE MECHANISM.

The Bedell patent, No. 787,821, claims 1, 2, and 3, for a gear wheel for actuating the second keyboard roll in linotype machines from the first, *held* void for lack of invention.

18. PATENTS ⏤328—INFRINGEMENT—LINOTYPE MECHANISM.

The Homans patent, No. 837,276, claims 1 and 9, for a knife-adjusting device in slug-trimming mechanism for linotype machines, *held* not infringed.

19. PATENTS ⏤328—INFRINGEMENT—LINOTYPE MECHANISM.

The Rogers patent, No. 925,843, claims 1, 2, 3, and 4, for a mold disc support for linotype machines, construed, and *held* not infringed.

20. PATENTS ⬅︎328—INFRINGEMENT—LINOTYPE MECHANISM.

The Bedell patent, No. 848,338, claim 4, for means, operative from the front of the machine, for disconnecting the ejector slide in linotype machines, is limited to the particular means specified, or its equivalent. As so limited, *held* not infringed.

21. PATENTS ⬅︎328—VALIDITY AND INFRINGEMENT—LINOTYPE MECHANISM.

The Rogers reissue patent, No. 13,489 (original No. 615,909), claims 6 and 7, for an elevator for linotype machines employing matrices with two characters each, and provided with a movable matrix supporting blade, are entitled to a liberal construction, and a broad range of equivalents. As so construed, *held* infringed.

22. WORDS AND PHRASES—"YIELDING"—"RESILIENT"—"SPRING-SUPPORTED."

The word "yielding," as used in a patent claim, is not the equivalent of "resilient," or "spring-supported," but may be applied to a part which is retractable at will.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Yielding.]

In Equity. Suits by the Mergenthaler Linotype Company against the International Typesetting Machine Company. Decree for complainant in first case, and in part in second case.

There are enumerated in the pleadings as the subject of suit 28 patents, but only those hereinafter specifically considered were finally put in issue. Either by reference in the bills of complaint or by notice of particulars, complainant specified before trial the several claims of the patents relied upon and said to be infringed. At or immediately before hearing, many of these claims were withdrawn from the consideration of the court, and no evidence was given in support of any claims, except those hereinafter specifically mentioned.

Frederick P. Fish and Robert F. Rogers, both of New York City, and Odin Roberts, of Boston, Mass., for complainant.

Edmund Wetmore and Robert D. Eggleston, both of New York City, for defendant.

HOUGH, District Judge. There having been no formal discontinuance of these actions, either in respect of the patents as to which suit was practically abandoned, or as to the claims originally relied upon and then withdrawn, the defendant is entitled to a decree dismissing the bill as to said patents and said claims. Such dismissal will not be without prejudice, but will be general.

Complainant has for many years developed, improved, manufactured, and sold what are generically known as "Linotype Machines," originally constructed under the well-known Mergenthaler patents. It was so often said in argument and briefs that it may be here asserted that the basic and organization patents on composing machines have expired, and that, during the life of the patents which insured control of the business, every effort has been made by complainant to obtain by invention or purchase what are commonly known as improvement patents.

Mr. Dodge, who for many years has been the president of complainant, is himself a frequent patentee, and Messrs. Rogers and Kennedy

⬅︎For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

have contributed a good many inventions; Mr. Rogers especially having been for years in the employment of complainant, primarily as an inventor.    Mr. Homans was likewise a frequent patentee, whose inventions (in so far as they related to linotypes) were apparently invariably assigned to complainant; but it does not appear whether he was regularly employed on a salary.

By these usual and proper methods complainant has acquired, and now owns, all the patents here in suit and some dozens of those put in evidence.    As the result of what may be called syndicated invention of this kind, complainant possesses (as shown by the exhibits herein) a long line of subsidiary inventions or patents, each one covering some specific part of the standard Mergenthaler linotype, a machine used all over the world and exemplified by the exhibit referred to during the lengthy trial of these cases as the "No. 5."    Upon the expiration, in 1912, of the latest patent regarded as basic and affecting such machines, the defendant company was organized, for the expressly avowed purpose of making (inter alia) a machine which at two-thirds of the price would be the equivalent of and do just as good work as the No. 5.    I think it proven that, with some possible exceptions in small detail, defendant has succeeded in this effort, the result of which has been referred to during this litigation as "Exhibit 23," or the "Intertype."

As shown by its advertisements and publications of divers kinds, defendant used in producing Exhibit 23 the services of Mr. Homans, who has been held out to the world as the deviser or designer or organizer of linotype No. 5.    Defendant has sought to induce the purchase of machines like Exhibit 23 by statements (in divers forms) that its machine had been designed by Mr. Homans, and such words have been used as the following:

"The Intertype (Exhibit 23) is the better machine because it was designed by the man who invented the Model 5 linotype; he put into the Intertype the result of seven years' experience with the Model 5."

It does not appear that Homans has become a shareholder or officer of defendant, nor does the evidence reveal the exact nature of his business relations; but it is in evidence and has been admitted that defendant induced Homans to terminate business relations with complainant, in order that he might make for it something that could be sold in competition with complainant's No. 5 without infringing the long line of secondary, subsidiary, or improvement patents owned by complainant, and to which Mr. Homans had made substantial contributions.

Before taking up the various patents in suit, it seems best to state generally my position on several questions of law which have been fully argued, even though the view taken as to invention and infringement may render some of these points inapplicable.

### Estoppel as to Patents by Homans.

[1] Complainant asserts that defendant, though a corporation, is so associated and has so co-operated with Mr. Homans for the purpose of making and selling the thing (Exhibit 23) charged to be an infringement as to affect said defendant with an equitable estoppel, preventing

it from alleging invalidity of any patent by Homans affecting the linotype and here in suit. This proposition is worked out from the admitted doctrine that a patentee who has sold his patent is estopped to deny its validity when pursued by his own assignee.

Homans is not a defendant here; no injunction is sought against him. He personally is not said to be an infringer, and defendant relies upon the cases of Boston Lasting Machine Co. v. Woodward, 82 Fed. 97, 27 C. C. A. 69, Babcock & Wilcox Co. v. Toledo Boiler Works Co., 170 Fed. 81, 95 C. C. A. 363, and Trussed Concrete Steel Co. v. Corrugated Bar Co. (D. C.) 214 Fed. 393. The ground of decision in these cases is well stated by Putnam, J. (82 Fed. at page 98, 27 C. C. A. 70), thus:

"While a person occupying a subordinate position may be in privity with his principal, in the sense in which that word may properly be used in this connection, the reverse is not ordinarily true."

This means that, because Homans is an employé or subordinate, the defendant cannot be said to be in privity with him; and as Homans himself could not be enjoined in this suit, it is impossible to work out an equitable estoppel as against the corporation employing him, which is not technically in privity with him. As a piece of technique this statement is doubtless correct, but I cannot admit that equitable estoppel is to be limited to such narrow grounds.

The first question in each litigation is to decide the nature of the employment by an alleged infringer of the assignor patentee. If he is a mere subordinate, if he acts only under instructions, if he is not the brains of the infringing combination, it is obviously improper to promote him out of his place and treat the employer as the equal of the employé. But where a man who has assigned his patent is employed by an alleged infringer for the very purpose of avoiding (if possible) his own patent, and when the designing of such evasion is definitely committed to said patentee, it appears to me that such unusual relation between the employer and employé calls for an application of the equitable rule of which as yet no instance is found in the books.

Believing the circumstances shown here to be quite new, I am of opinion that they warrant the holding that this defendant, so far as its Exhibit 23 is concerned, is estopped from denying the validity of any patent granted to Homans assigned to the complainant, sued upon here, and said to be infringed by said exhibit. Such an estoppel, however, no matter against whom it may be upheld, is "limited in character, and [even] an assignor, when subsequently sued for infringing the assigned patent, may show the state of the art for the purpose of limiting its scope." Babcock, etc., v. Toledo Co., supra, 170 Fed. at page 84, 95 C. C. A. 366; Standard Plunger, etc., Co. v. Stokes, 212 Fed. 941, 129 C. C. A. 461.

### Copending Patents as Anticipations.

[2] It is thought to be plainly established in this circuit by controlling authority that as between two patents, the applications for which were in the Patent Office at the same time, neither is prior art as against the other; the reason for the rule being that, assuming each

applicant to be a person skilled in the art, neither could know of the other's confidential communication to the Commissioner of Patents contained in his application.

But this does not prevent a contest between two such patentees as to who was the original inventor; such contest, however, being predicated upon the assumption that the two patents are for the same device. Either or both of the patentees may by competent evidence carry the actual date of invention back of the assumed date, viz., the day when application was filed. Sundh Electric Co. v. Interboro Rapid Transit Co., 198 Fed. 94, 117 C. C. A. 280; Vacuum Engineering Co. v. Dunn, 209 Fed. 219, 126 C. C. A. 313.

### The Admissibility and Effect of Mergenthaler Patent 614,230.

[3] This patent is owned by complainant, and was originally sued upon, but abandoned. The complainant has introduced evidence to show the patent inoperative, and to this evidence defendant objected, on the ground that it was inconsistent for complainant to first sue on a patent and then attack it. I am of opinion that a conclusive answer to this contention is that defendant itself introduced the patent mentioned in order to show the state of the prior art. Whatever inconsistency might have resided in plaintiff's attacking its own patent was cured by the introduction of the document in evidence by defendant.

### Construction of Claims.

[4] All of the patents here in suit relate to mechanical devices, possibly important in themselves, but in comparison to the aggregate of invention displayed by the linotype machines very small indeed. Each of them displays by diagram and describes in words a particular method of arriving at a certain result. Most of them contain in their specifications the cautionary statement that the applicant shows his preferred method, but that other methods of producing the same beneficial effect will occur to the skilled mechanic. The claims in suit are frequently, if not usually, for combinations, couched in very broad and general terms.

This condition is not infrequent, but it must be unusual for so many instances thereof to occur at a single hearing; and naturally, therefore, discussion has been acute as to the proper method of approaching, considering, and interpreting patent claims generally, and claims of the kind above described in particular. Complainant has insisted that its claims are to be taken literally, and that, if any given claim reads upon the device said to infringe, it is the duty of the court to instantly apply such language as is found in National Enameling, etc., Co. v. New England, etc., Co., 151 Fed. at page 23, 80 C. C. A. 489:

"The rule is fundamental, in the construction of patents, that the claim in the patent is the measure of the invention. The specification may be referred to, to explain any ambiguity in the claim, but it cannot be referred to for the purpose of expanding or changing the claim."

And again in White v. Dunbar, 119 U. S. 47, 7 Sup. Ct. 72, 30 L. Ed. 303, are found the words:

"The claim is a statutory requirement, prescribed for the very purpose of making the patentee define precisely what his invention is; and it is unjust

to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms."

The language just quoted is from Justice Bradley's famous "Nose of Wax" decision; and it is curious to note that the citations made above, and many others relied upon by complainant, are from cases wherein the courts thought that the claims of the patent were so inartifically or insufficiently drawn as not to protect the real invention displayed by the specifications and drawings. The thought behind such remarks as those just cited is fully and acutely revealed by Wallace, J., in the National Enameling Case, supra, 151 Fed. at page 29, 80 C. C. A. 495:

> "Courts lean towards reading into the claims of a patent such limitations as will save the real invention as disclosed by the specification and the prior state of the art. But when the claims are drawn in broad and nebulous terms, with the apparent purpose of enabling the patentee to monopolize an important industry, the courts should be slow in attempting to sustain their validity by narrowing them beyond the boundaries which are clearly warranted by the specification."

But cases frequently arise, and this is one of them, where contest rages around the proposition that the claim, though plain enough and clear enough, is much broader than the invention. In my opinion there is no doubt as to the law of interpretation in such instances. The phrase made so much of, "the claim in the patent is the measure of the invention," is to be understood in the light of known statute law and familiar practice. The claim is what the patentee (or his attorney) asserts to be the measure or description of the invention. To be sure, it can never be affixed to a patent grant until it has been approved by the Commissioner of Patents; but it by no means follows that such official approval gives to the claim a sacrosanct character. There is one question always open to investigation and capable of being put in many ways, namely: *Is the claim true?* Is it *true* that the invention is measured by the claim in suit?·

If this could not be done, most patent litigations would cease, and the specifications of a patent would be useful only to the mechanic who wished to construct the patented device. Such expressions as "expanding" or "limiting" or "contracting" the claims of a patent are no more than expressions of dissatisfaction with judicial efforts to ascertain the "true meaning and intention of the parties when [the patents] were made and allowed," and in ascertaining such true meaning "the specification of a patent which forms a part of the same application as its claims must be read and construed with the latter." Ottumwa, etc., Co. v. Christy, etc., Co., 215 Fed. 362, 131 C. C. A. 504.

Into that specification is read all the prior art as revealed by legal evidence, and it is by measuring the addition to the sum of human knowledge shown by the specification to have been contributed by the applicant that the truth—i. e., the true meaning of the claim—is to be discovered. Many a falsehood has passed the Patent Office in the shape of a claim; nor has all wisdom in discovering such falsehoods been found to reside in the courts, but each investigating authority in its turn, from the primary examiner to the Supreme Court, is but engaged in ascertaining one thing, viz.: What is the invention revealed,

not only by the claim (which, after all, is but an opinion), but by the specifications, drawings, prior art, and publications as interpreted by the aid of human experts?

I do not say it is the only method, but surely it is an orderly and legal method, of investigation, to first ascertain whether the mental processes, out of which every application for a patent must grow, rise to the dignity of invention; if invention is found, it must be assigned to one of those convenient categories justified by a species of secondary law, and called primary or secondary inventions. When the patent has thus been assigned to its rank, the investigator is ready to consider the question of equivalents. I do not think it necessary to fortify the foregoing statement with authorities, numerous as they are; and it has been made only to fairly put on record my own attempted mental processes in solving what are really two questions of fact—questions which in a jury trial are always left to the jury—namely, invention and infringement.

As to interpretation (or mind working), a good method of procedure in a case perfectly illustrative of the problem here presented is well shown by Rose Mfg. Co. v. Cox Brass Mfg. Co. (D. C.) 201 Fed. 930. This decision of Judge Hazel shows how a man of experience ordinarily operates, in respect of the interpretation of secondary patents. It is assumed, without further discussion, that all of the patents here involved are of a secondary nature.

One other statement or admission as to my own preferred method of investigating mechanical or design patents may at least assist criticism. Before it seems to me possible to measure invention, or declare the true intent and meaning of the parties, or form an opinion as to the truth or falsehood of the claims, or venture upon an interpretation thereof, it is obligatory to find out the *thing* that the alleged inventor has made, and to understand how that *thing* works, what result it produces, and how the same is reached. When this *thing* is ascertained, the normal limit of the invention is clearly seen.

The importance of the invention should next be judged from the prior art or the absence thereof. When the nature of the *thing* and its importance have been grasped, it is time enough to study the claim. If it is found that the claim covers a larger invention than is revealed to the eye by the *thing* constructed and shown, such claim can only be fully validated by a consideration of the importance of that thing in the light of the prior art; and thus the doctrine of equivalents is reached.

That doctrine itself is but the usual way of expressing the unity or severance of form and substance, so finely stated in Winans v. Denmead, 15 How. at page 343, 14 L. Ed. 717. The patents submitted for test in these actions, I shall treat in groups in the order in which evidence was taken; each patent or group relating to one especial device on the Intertype.

## I. The Magazine Gate Patents.

These are Cooney and Totten, 759,501, with claim 11 in issue, and Homans, 888,402, with claim 14 in issue.

[5] The first of these patents informs us (without contradiction) that prior to Cooney's invention it had been the practice to hinge the "throat" or channel entrance permanently to the upper end of the magazine. It is vital to a successful linotype that magazines should be removable, so that as many different fonts of matrices may be used as business requires. The throat is rather a delicate portion of the magazine, which in other respects is solid and not easily injured. But when such throats were permanently fixed to magazines the whole apparatus had to be changed whenever it was desired to use a new font. This, as Cooney says, "added to the weight and to the labor of the attendant," and moreover the throat was liable "to fall out of position [and have] its partitions bent and rendered inoperative." The substance of Cooney's invention was to avoid the necessity of providing a throat or channel entrance for each magazine, and to put upon the linotype a permanent throat, which would serve for any number of magazines, with channels corresponding to those existing in the throat.

The most casual observation of a composing machine shows the great value of a device of this nature; but defendant's alleged infringement does not exist in violation of the claims which cover this substantial advance in the art. If a magazine without a throat was to be removed, it would naturally be tilted in the process of removal, and the matrices would tend to fall out. It was therefore necessary to provide some method of closing that end of the magazine where the throat was placed when in operative position. "For this purpose," says Cooney, "we extend a gate or guard across the upper end of the magazine." And he proceeds to show a gate consisting of a right angle of metal hinged at the angle and so arranged in connection with a spring affixed to the magazine proper as to cause one side of the angle to operate as a gate by pressure of the spring (through a lever) on the other side of the angle. When a new magazine was inserted, and the throat moved into operative position, a projection on the throat caught the gate and lifted it up against the pressure of the aforesaid spring. Taking away the throat permitted the gate to close again.

This device is covered (as an incident to the main invention) by several claims, but the only one in suit is in the following language:

"11. In a linotype machine, in combination with a removable magazine, a gate or guard movably connected to its upper end to prevent the accidental escape of the matrices when the magazine is separated from the machine."

[6] The Homans patent covers an entire linotype machine, and the object to be reached is to provide "a simple and inexpensive construction and arrangement under which two, three, or more magazines may be combined with a single composing mechanism in such manner that matrices may be delivered to any line from any one or more of the magazines, and also to provide mechanism by which the matrices may be returned," etc. As an incident of this machine it was thought desirable "to lock the matrices in the magazines of each pair when the magazine is to be removed from the machine."

In order to produce this result, Homans shows an apparatus by which projections upon a bar are made to underride the side ears of the lowermost matrices in the various columns or channels of each

magazine, thereby "locking the matrices within the magazine." It will be observed that this plan of operation does not contemplate merely closing one end of a channel or passage within which there may be one matrix or twenty, and Homans does not call his device a gate or guard; it is a "matrix locking device." His specific apparatus is covered in several claims, but the only claim in suit is as follows:

"14. In combination with a supporting frame and a removable magazine, a movable matrix locking device at the upper end of said magazine, and a spring whereby said bar is moved to confine the matrices as the magazine is moved from its operative position."

The Intertype is a single magazine machine, and is substantially like that for which Cooney's apparatus was devised. It shows a gate or guard normally held over the upper end of the magazine by ribs or slats of steel fastened to the gate itself and to the underside of the magazine. When the magazine is placed in operative position, this gate meets a detent or projection on the main frame of the magazine support. The magazine itself, being very heavy in comparison with the gate, assumes its normal position on the main frame; but the gate is depressed by the action of the detent and the springing or yielding quality of the steel slats which normally keep the gate in position.

It was not new to have a gate or guard at the end of a magazine. The only new thing done by Cooney was to interpose a pressure which would automatically open a gate as the magazine settled into operating position.

The bill is dismissed as to the Homans patent because I do not think that Homans shows a gate or guard at all. He invented a "matrix locking device," and in no true sense of that phrase as Homans used it is there any such device upon the Intertype.

The bill is dismissed as to the Cooney and Totten patent, because the invention shown, so far as the gate and guard is concerned, is so slight as not to justify or render true such a broad claim as No. 11. This claim will read upon any gate. It is thought doubtful whether the apparatus on the Intertype is the mechanical equivalent of what Cooney exhibits; but, even if it is, the invention of the patent in suit is so narrow as to render it necessary to confine its application to the specific device shown.

## II. The Space-Band Buffer Patent.

[7] This is Kennedy, 586,337, with claims 1 and 2 in issue. Mr. Kennedy says that the essence of his invention "lies in a buffer located below the composing device, which serves the twofold purpose of checking the descent of the spacers, in order to relieve their ears from shock, and holding the spacers against a turning or twisting movement." It is not necessary to set forth the claims at length, and the spacer in use on the Intertype exactly corresponds to what Kennedy describes and is used on the linotype No. 5.

In my judgment the only defense to this action is a prior use in the office of the Philadelphia Times. It is admitted that proof of such use must be beyond a reasonable doubt. This is one of the instances where seeing and hearing witnesses in a patent suit is partic-

ularly valuable. After seeing and hearing especially the witness Roller, I am satisfied that he intended to tell the truth, and that when he said that he saw a device which (if it existed) was a complete anticipation on a linotype machine, and used it before the time that he left the employment of the newspaper in December, 1895, I am convinced that he did tell the truth.

As to this patent the bill is dismissed.

### III. Vise Jaw Patents.

These are Rogers, 619,441, with claims 1, 2, and 4 in issue; Champion, 719,436, with claims 3, 6, and 7 in issue; and Morehouse, 826,593, with claims 1 and 2 in issue.

[8] There is no evidence that any of these patents ever resulted in commercial machines containing devices exactly like those portrayed in the patents. The Rogers device is said to be present in principle in linotype No. 5, but physical representation goes no further. In all three instances the inventors assigned before issue to the complainant herein.

The vise jaw apparatus on the Intertype was designed by Homans, and is obviously the exact thing shown in a patent to him (No. 1,107,-758). The arrangement of the left-hand vise jaw in any of the composing machines shown to me is a matter of considerable delicacy. There must be provided what has been called a "pinching" or "winking" movement, by which the jaw moves a microscopic distance to firmly grasp the matrices at the moment of presentation to the mold; but, if that firm grasp be not released, the matrices cannot be taken away by the second elevator for the purpose of redistribution. Consequently the jaw, which has so slightly advanced to pinch the matrices, must after the molding process is completed automatically retreat the same distance.

Since the utility of the linotype depends on its ability to print type lines of varying lengths, it is obvious that the vise jaws must be adjustable to a type line of any length within the capacity of the machine, and this must be effected without interfering with the above referred to pinching or winking process. That process, as above stated, is automatic, i. e., it takes place in the normal operation of the power actuated machine; but adjustment to the requisite length of type line must be done by special human action.

The operator sitting before the keyboard was formerly obliged to get up and go to one side or end of the machine in order to effect this change in vise jaw adjustment requisite for type line changes. Rogers' patent was not intended to relieve the operator from the necessity of rising from his seat, but it did provide a swifter and more easily operated method of changing the adjustment of the left-hand jaw, and is confessedly an improvement upon or rearrangement of the parts of the device shown in patent to Mergenthaler, 436,531, and specifically illustrated in Figure 17 thereof. (The same letters of reference are used throughout the two patents).

Rogers says (and all the evidence bears him out) that the essence of his invention resides "in combining with the sliding jaw and the

nut an *intermediate adjustable support by which the jaw may be sustained at different distances from the nut.*" He accordingly shows the same screw as that displayed in the prior Mergenthaler patent, but reduces its length and introduces for the sole purpose of regulating adjustment a rod or bar. He then sets forth the claims in suit, thus:

"1. In a linotype machine, the combination of a sliding jaw, a screw and nut supported thereby, and an adjustable connection between the nut and the jaw, substantially as described.

"2. In a linotype machine, a sliding jaw, a movable nut or support therefor, and an adjustable toothed connection between the jaw and nut."

"4. In a linotype machine, the combination of an adjustable jaw, a longitudinally adjustable rod or bar to support the same, and a locking device engaging said bar to hold the same in predetermined positions only, whereby the jaw may be speedily set for different standard measures."

The leading characteristic of claims 1 and 2 is the existence of an adjustable connection between the jaw and the "nut." The jaw is of course the vise jaw, and the "nut" ($m^{13}$) is a piece of metal fast to the frame of the machine, which at once furnishes support to the rather long rod or bar ($A$), and likewise gives a place for regulating the adjustment of the same far superior to the process of the prior art, which consisted in unscrewing certain washers at the head of the regulating and supporting screw, thereby loosening the same and rendering possible the process of regulation.

The fourth claim is to my mind an example of an "untrue" claim. It will read (except for the word "speedily") upon the devices of the prior art, and particularly upon the Mergenthaler machine made under patent 436,531.

The Homans device, which is alleged to infringe, consists essentially of a rack bar extending from the jaw through what may be called a nut fixed in the frame. In that fixed nut (or in the frame of which the nut is a part) is a screw; but there is no screw from the frame to a nut, nor is there a bar from the nut to the jaw. I can see no similarity between Rogers' construction, as shown in the diagrams attached to his patent, and the defendant's device. The case for the complainant is summed up by a remark of Mr. Woodward (plaintiff's expert) in this form:

"The nut is stationary, but the screw moves and virtually performs the function of the nut in Rogers."

It seems to me that this is very far-fetched. In my opinion the Intertype does not infringe on the Rogers patent so far as claims 1 and 2 are concerned, and claim 4, not being justified by the conditions of the prior art, must be pronounced invalid. Put in its shortest form, my belief on this head is that Rogers did not invent the longitudinal adjustable rod or bar in combination with an adjustable jaw and a locking device; he only invented one particular form of such combination. Viewed most favorably for him, it may be said that he was the first to invent that form of the combination which embraced and showed adjustable connection between the nut and jaw. I doubt this; but, even if it be true, defendant does not infringe.

[9] It is not necessary to quote the claims of the Champion patent in suit. The patent may be shortly described as displaying a handle

conveniently connected with the bolt (or vertical pin B) of the Rogers patent, whereby that bolt could be raised so as to permit the movement of the bar which regulates the adjustment of the vise jaw. This handle or button was so placed as to be within reach of the hand of a seated operator. Champion then proceeded to claim in combination with the apparatus of Rogers "locking devices extended therefrom within reach of the operator at the keyboard." This claim, literally construed, would prevent anybody else, except Champion, regulating the left-hand vise jaw of a linotype machine through means reachable by a seated operator. An examination of Champion's device shows that it scarcely rises to the dignity of invention. He did not really invent nor think of anything else except the particular form of simple rock shaft and handle shown in his drawings and described in his specification. The patent must be limited to the apparatus shown, and, as so construed, is not infringed.

The Morehouse patent has not been dwelt upon in argument, and I do not think it necessary to say more than that, if the claims of Rogers have not been infringed by the Intertype, a fortiori those of Morehouse have not been violated.

The bill is dismissed as to all three of the patents concerned in this branch of the case.

## IV. The Pi-Stacker Patent.

[10] This is Rogers, 630,112, with claims 1, 2, and 3 in suit. The following is an illustrative claim:

"2. A sorts-holding attachment for a linotype machine, comprising a stick or receiver, open at the top and front, a matrix feeding or assembling device at one end thereof, and a resistant to sustain the matrices as they are assembled in line."

The same enumeration of elements is put into combination claims numbered 1 and 3; but, whether stated technically as a combination or as an enumeration of parts of a machine, there is confessedly but one new element. As Mr. Woodward said:

"The new element is the open stick or holder and the feed device operating in that particular way."

He was then asked:

"Q. What particular way?  A. Well, as a star wheel."

The rest of the evidence shows that the witness did not mean by this statement that star wheels were new, or that a star wheel operating to drive or place matrices in an open holder was new. In my judgment, this is a device of the narrowest kind; there was nothing new about it, except that Mr. Rogers ventured to eject his matrices from a well-known tube by a well-known star wheel into a stick or receiver which was "open at the top and front." But he did not quite dare to trust to gravity to keep the matrices in place when they had reached the open stick, for he left a recess between the bottom and back plates into which the lower ears of the matrices could fit. This recess was found unnecessary, for it is in evidence that this invention is on the linotype No. 5, and no such recess is discoverable. The re-

sult is that what the patentee did was to take the forward side or partial side off a perfectly familiar pi-stacker.   In my judgment this was not patentable invention.   It is rather curious to note that the only novelty discovered by Mr. Woodward and testified to by him about this patent was not even mentioned by Mr. Dodge when acting as attorney for Rogers, as shown by the file wrapper.

The foregoing renders it unnecessary to decide the question of prior use raised by the introduction in evidence of the Ott. Mergenthaler catalogue of 1898 and the replying evidence of Mr. Rogers to the effect that he really invented this pi-stacker long before any application for patent thereon was made.   But it is plainly shown by the catalogue referred to that the very thing here patented was offered for sale before this application was filed by persons who did not think it worth while to ask for a patent thereon.   I am of the same opinion.

The bill as to this patent is dismissed.

## V. The Magazine Channel Patent.

[11]  This is Muelheisen, 718,781, with claims 2 and 3 in suit.  It is stated in argument that in the prior art:

"Although in some instances magazine channels were of different widths, they were generally located at the same intervals counting from center to center. The distributer was made to release the matrices at equal distances. In the earlier machines the reasons for the equal spacing notwithstanding differences in the width of the matrices was to permit the interchange of positions of matrices in the magazine and a consequent change in the keyboard arrangement. Therefore all of the channels had the same width, namely, that of the thickest matrices they had to accommodate, and the distributer rail was formed with combinations of the same extent, so as to co-operate with the channels described. When much thicker matrices came to be employed, and because of the standard construction of the magazine and the fixed length of the distributer rails neither could be extended without reorganizing the machine, Muelheisen conceived the idea of adapting the limited space to the much thicker matrices by varying the width of the channels, always from center to center, and of correspondingly varying the length of the distributing combinations on the bar."

I do not think that this is a description of what Muelheisen invented, for he says of his own thoughts that in machines—

"as heretofore constructed the upper ends of the magazine channels have been of uniform width, the plates at the entrances being spaced about a quarter of an inch apart. The teeth or ribs on the distributing rail were likewise arranged to drop a matrix at every quarter inch. I have discovered that by making the upper ends of the channels of varying widths to correspond with the thicknesses of their respective matrices 30 per cent. additional matrices may be included in a magazine of the construction and width now employed, and by modifying the present magazine entrance construction I am enabled to provide double the variety of matrices now available."

He then proceeds to show by drawings:

"Channel entrances of different widths, each being but slightly wider than the thickness of the matrix for which it is intended."

Muelheisen further states that he believes himself to be the first to provide an automatic distributer—

"adapted to distribute matrices into a magazine having channel entrances of different widths; * * * in the present invention the channel entrances or

throats are adjacent, being separated only by thin plates of uniform thickness. The matrices are lifted from the distributing rails when they are opposite the center lines of the entrances of their respective channels, and these center lines are unequally spaced; hence the unequal spacing of the distributer rails."

There is nothing in all this about the employment in an advancing art of thicker matrices. Muelheisen's real invention was his auxiliary distributing rails, by which he hoped to handle and redistribute in a given time more matrices than had ever been done before. And it is quite probable that his change in the relative size of either the throat entrances or the magazine channels was conceived as an assistance to the operation of his auxiliary distributing rails.

So far as shown here, no machine in existence embodies Muelheisen's whole idea; certainly the linotype No. 5 does not show even an unequally spaced distributer rail, nor magazine channels, nor entrances of unequal widths. Yet it is sought to subject the defendant to the claims in suit, one of which is as follows:

"In a linotype machine, in combination with matrices of different thicknesses, a magazine having entrances of different widths corresponding to their respective matrices, the distances from center to center of said entrances being unequal."

The other claim in suit is similar, except that it includes in the combination a distributer adapted to deliver matrices into channels of the kind described. In order to apply this patent to the Intertype, the claims relied upon must be wrested from their context and made to mean what Mr. Woodward said Muelheisen did mean when he expounded the patent:

"It was Muelheisen's invention to make the thickness of the walls between the channels, so to speak, of the same thickness, regardless of the thickness of the matrix, and by that he accumulated an additional distance by the side of the magazine with the same number of channels which he estimates at 30 per cent."

It is obvious that such an explanation as this cannot possibly apply to a magazine of the construction of the Intertype, and Figure 15 of the patent in suit seems clearly to indicate that Muelheisen was talking about a rectangular magazine. The result of the argument advanced must be this: Muelheisen's invention relates to a peculiar form of linotype, in the devising of which it may well have been advisable, if not imperative, to economize space in the magazines he intended to use. His claims must be understood as referring to what he had in mind; and while it is quite true that, if advantages are revealed in a patent, the patentee is entitled to all those advantages, whether he clearly saw them or not, it is not true that a peculiar form of construction, thought out only with reference to a particular machine, shall be forbidden to all persons who may wish to use it in other and different machines. The question is one of degree.

From the advertising matter of defendant it appears that by the unequal spacing of channel entrances and distributer bar "the largest characters have relatively as much space (in the channels) as the smallest ones," so that with "space equalized in channel entrance thick matrices have more time to drop." It is very doubtful on the evidence

whether this is any advantage at all; but it is perfectly plain that Muelheisen's real invention bears no relation at all to the Intertype, and in my judgment the incidental change from uniformity to dissimilarity in size of channel entrances on the part of the makers of the Intertype does not constitute an infringement. If this be not true, then what Muelheisen shows in respect of his change in relative sizes of entrances *standing by itself* does not constitute invention.

It is only when this detached portion of Muelheisen's thought is considered that anything like infringement can be suggested. Therefore it is a fair test to inquire whether Muelheisen could have patented this single thing separated from the rest of his elaborate device. I think he plainly could not. The bill is dismissed as to this patent.

## VI. The Magazine Support Patents.

[12] These are Dodge, 797,412, with claim 9 thereof in suit, and Homans, 830,436, with claim 7 in suit. The removable magazines of such machines as the Intertype and the No. 5 are heavy, and when in operating position necessarily so raised upon a frame or bedplate as to make their removal a serious matter, unless they can be mechanically shifted into a position favorable for human exertion. Dodge shows a frame for a magazine which (so to speak) opens downward like some trapdoors, and he claims as follows:

"9. In a linotype machine, the combination of a main frame, a distributing mechanism thereon, a removable magazine arranged in receiving relation to the distributer, and a magazine sustaining frame hinged at the end remote from the distributer, to swing upward and downward."

Giving this claim its fullest scope, I am of the opinion that the magazine sustaining frame on the Intertype is not "hinged at the end remote from the distributer," nor does it "swing upward and downward"; therefore there is no infringement.

[13] Homans presents what he calls a sliding and tilting frame. He is talking about a double magazine machine, and he desired to remove (if necessary) one magazine at a time. He shows and describes a device which appears to me to be of a very ordinary mechanical variety, and the claim in suit founded thereon is as follows:

"7. In a linotype machine, the combination of a main frame, an inclined removable magazine, and a secondary frame to sustain the magazine in its operative position, said secondary frame movable bodily in an endwise direction rearward and downward, with the magazine thereon, whereby the removal and application of the magazine is facilitated."

The defense is noninfringement, and it is urged that the Intertype construction shows a movement of the magazine frame in an arc of a circle because the frame itself is supported by a rigid projection on its underside which is hinged to the main frame of the machine, whereas Homans' construction shows a motion, not circular, but "sliding and rolling" to the rear.

It seems to me that this difference is superficial. There is an obvious and generic difference between hinging a magazine frame like a door, as Dodge did, and obtaining a movement in an arc either of a circle or other more complex figure. The defendant's magazine frame

describes an arc, and so does Homans. I am inclined to think that there is full mechanical equivalence in the two motions. But, even if this be not quite true, the great difficulty with defendant's position is the total absence of any evidence in this case revealing the state of the prior art. The references do not seem to me to be worth comment, except to note that, of course, Dodge was prior art to Homans.

Doubt is resolved by observing that defendant's device is shown in Homans' own recent patent, 1,116,280, and I am therefore of opinion that this defendant is estopped from denying the validity of the Homans claim in suit, and, if its validity be admitted, I think infringement is proven. Complainant may take a decree on this patent.

## VII. The Keyboard Lock Patent.

[14] This is Kennedy, 797,436, with claim 1 in suit. The purpose of this device is plain from the name applied to the patent in the course of trial. It is agreed that:

"It is old in typewriters to provide a bar which extends underneath the pivoted key levers which operate the type bars, which bar can be moved in the plane of action of those levers and lock them."

Mr. Kennedy says in his specification that his locking bar may be mounted in any suitable manner, provided it is adapted to engage and disengage the key bars (all the foregoing is old), and it may be operated by any suitable device extended forward within reach of the operator at the keyboard. Therefore the only new idea that the patentee had in mind was to bring the control of his locking device within reach of a person who was operating a very much larger machine than a typewriter; it being common knowledge that locking devices on a typewriter are within reach of the operator.

To put in practice his new idea Kennedy shows a finger lever arranged parallel with the keyboard and singularly like the similar levers of the typewriter art. The claim in suit is:

"1. In a linotype machine, a series of finger key levers $B$, in combination with the vertically guided shouldered bars $D$, connected with the respective keys, the transverse locking bar $E$, mounted to engage the shoulders of the vertical bars, and a device for operating said bar extending thence to the front of the keyboard, whereby the locking device located at the rear may be actuated by the operator sitting in front of the keyboard."

The defendant's apparatus does more than merely lock or unlock the keys. There is provided on the main frame of the machine a handle operating a cam which raises and lowers the lower end of the magazine, and thus permits the magazine either to rest upon, or prevents the magazine from resting upon, a rod which locks or unlocks the keys, according as the magazine is or is not in operating position.

The claim in suit will not read upon the defendant's device unless complainant is entitled to hold every one an infringer who by any method reachable from the operator's chair locks or unlocks the keyboard. The claim is entitled to no such construction, and, assuming that invention exists in the patent, it is not infringed, and as to this patent the bill is dismissed.

## VIII. The Mold-Resistant Patent.

[15] This is Hensley, 643,289, with claims 1, 2, and 3 in suit. In my judgment defendant has offered no evidence which constitutes a defense to this patent. Hensley shows as the method of producing his result an indentation in the periphery of a cam. The Intertype contains the cam, and the cam has the indentation.

It is said, and I think with probable truth, that the machine will function without this indentation in the cam; but it does not follow that it will always do so, and Hensley pretends to have invented nothing more than a measure of precaution to prevent the machine, when heated and running fast, from injuring the matrices through the momentum of the mold. It is also said that, in machines more recent than Exhibit 23, the characteristic indentation of the periphery has been abandoned. Nevertheless infringement is shown by the existence of No. 23, and the complainant may take a decree upon this patent.

## IX. The Mold-Support Patent.

[16] This is Dodge, 739,996, with claims 1, 2, and 3 in suit. The problem of this patentee is presented by the fact that the mold is fitted to the mold disc. It corresponds to an aperture or slot in the disc, and must be fastened to the disc. The pressure applied to separate a slug from the mold "tends to loosen or displace the mold in relation to the disc," which must necessarily be the case when power is applied, not equally over the whole disc surface, but specially at the place where the built-up mold is made fast.

The patentee stated that his invention lay "in providing firm supports against which the *mold as a whole* may be seated and sustained during the ejection of the slug." Of the claims in suit, Nos. 2 and 3 may be said to be confined to supports specifically bearing upon the mold proper; but claim 1 reads thus:

"In a linotype machine a mold and a slug ejector in combination, with means for rigidly supporting the mold against the thrust of the ejector."

The file wrapper of this patent shows that Mr. Dodge was confined by the Office to a banking against or supporting of the mold, as distinct from a support given to the disc itself. Mr. Woodward volunteered the statement that this patent "does not cover an abutment broadly for supporting the mold disc."

Defendant does not support the mold disc, nor do his abutments bear upon the mold proper; but he has constructed what may be called mold supports, which are themselves fastened to the disc, as is the mold. I am able to see no difference between putting pressure directly upon the mold, and putting the same pressure upon something else which supports the mold, provided that that something else is not the disc.

The molds of both complainant and defendant are fastened to (and in that sense supported by) a mold disc. Defendant's mold supports are themselves fastened to the mold disc. If defendant's mold supports were integral with the mold, they might cease to be supports; but they would function in exactly the same way as they do now, and

the abutments would then press on the mold and be plainly infringements. I think they are infringements as they stand, and complainant may take a decree on all three claims.

## X. The Gear Wheel Patent for Keyboard Rolls.

[17] This is Bedell, 787,821, claims 1, 2, and 3 in suit. The subject-matter here involved is a change in the actuation of the keyboard rolls from belt driving for each roll separately to the actuation of one roll by a belt and the connection of roll No. 2 with roll No. 1 by a gear wheel.

This is one of those questions as to which discussion gives no light. Confessedly belt driving and gear wheel driving are all old. It did not require any adaptation of either system to make it applicable to this part of a linotype machine. Undoubtedly the adaptation of a well-known device to suit the purposes of a special art has often been held to constitute invention; but it is not shown that there was any such adaptation here. The gear wheels on the linotype function exactly the same as they do anywhere else; both styles of driving were open to the world, and I am wholly unable to perceive that it required anything more than ordinary mechanical skill to do what Bedell did.

The bill as to this patent will be dismissed.

## XI. The Knife-Adjustment Patent.

[18] This is Homans, 837,276, with claims 1 and 9 in suit. The purpose of the device set forth herein is to adjust a slide containing a knife which will trim the slugs, the molding of which is one of the main purposes of a composing machine.

This knife must be adjusted to suit slugs of different sizes. Admittedly knives wherewith to trim slugs and divers methods of adjusting them are old. Homans shows what is alleged to be an advance on Meistrell, 578,065, in that he exhibited a "tapered form of the slide," which permitted "the slide to be clamped very securely in the exact position required."

Claim 9 in suit has not been explained by the evidence, and is drawn in careful correspondence to the exact device shown by Homans in his specification. I think it is plain that this claim has not been infringed.

Claim 1 is much broader, and is as follows:

"1. In a slug-trimming mechanism for linotype machines, the combination of the movable knife, its supporting slide guided in the frame, means for adjusting the slide to predetermined positions, and independent means for clamping the slide in the required positions."

Of the elements last above enumerated the movable knife, the supporting slide, and means for clamping the slide were all old; but the phrase "means for adjusting the slide to predetermined positions" is broad enough to read upon anything that will function in the manner indicated by the quoted phrase. What Homans shows is a wheel which regulates the position of the knife within certain limits, and such position is shown by an indicator which corresponds to markings

upon the wheel. It is obvious that, since the wheel actuates a screw, the adjustment is most exact, and the position of the knife can be regulated with microscopic fineness. Therefore Homans' "means for adjusting the slide to predetermined positions" (as shown in this patent) seem to me of great theoretical excellence, and I think it strange that, so far as the evidence goes, this plan of operation has never been reduced to practice nor become commercial.

The Intertype employs an entirely different principle. The knife can be set in 25 positions. These positions are determined by fastening the lever to the knife slide by means of a pin thrust through some one of these 25 holes. I am convinced that there is not the slightest mechanical equivalence between what Homans shows in the patent in suit and what he did in designing the Intertype. I am also clear that the invention of the patent was (in the light of the prior art) so narrow that neither Homans nor any assignee of his was ever entitled to claim and own all "means for adjusting the slide to predetermined positions."

Nor does the doctrine of estoppel go far enough to prevent Homans using, even as against his own patent, an inferior and wholly different method of construction. It is held that neither claim 1 nor claim 9 is infringed, and the bill will be dismissed as to this patent.

## XII. The Disc Support Patent.

[19] This is Rogers, 925,843, with claims 1, 2, 3, and 4 in suit. As composing machines became more elaborate, and probably of more varied capacity, it became advisable to leave—

"the entire face of the mold disc and mold exposed or uncovered, so that the projecting end of the mold liner and the mold-tightening screws will meet with no obstruction as the wheel revolves."

Mr. Rogers observed that it had been customary to strengthen or support the front of the disc against the thrust caused by the passage of the slug past the rear trimming knife, and this had been accomplished by placing near the front of the disc a banking piece bearing against the front face thereof. He exhibits in this patent a method of providing this necessary support without incumbering the face of the disc thereby, and thus characterizes his own invention:

"I believe it to be wholly new to support a mold disc against forward movement by a *support at the rear*, and this I claim broadly in any form the equivalent of that herein shown."

What is "herein shown" is a variety of flanges at the rear of the mold disc wheel, against which, or fitting into which, is a support or strengthening piece deriving rigidity (ultimately) from other portions of the machine not necessary here to mention. The Intertype shows no such flange or flanges as Rogers exhibits, and infringement cannot be found upon any reasonable construction of claims 2, 3, and 4, which specifically rest upon the existence of such "annular flange." Claim 1 is as follows:

"In a machine of the class described the mold disc having an annular surface, *in combination with a rear support engaging said surface* to prevent the disc from swinging facewise; the face of the disc being wholly uncovered as described."

The entire uncovering of the disc face is a result. The question is always: What means does the patentee show of accomplishing that result? He does it by a *rear support* engaging an "annular surface." The Intertype has a completely uncovered wheel disc face; but I do not think that it has a "rear support" in any just sense of that phrase.

The theory of the complainant is (as stated by Mr. Woodward) that the term "rear" means that:

"The support is back of the front surface of the mold wheel; it is to the rear of the front surface of the mold wheel, so that the mold wheel remains entirely unobstructed."

But (as above stated) Mr. Rogers could not patent an unobstructed mold wheel face, and his patent is not infringed unless there is a rear support. The Intertype succeeds in having such unobstructed mold wheel face by cutting away that portion of the face which is nearest the teeth, thus making an annular surface in the shape of a circle around the outer portion of the disc wheel. Against this resultant annular surface is put the support or banking. It is wholly in front of the wheel proper.

It does accomplish the same result as Mr. Rogers shows, but it does it in a wholly different way, and in my judgment it is not applied at the rear or from the rear or to the rear of the mold disc wheel. In other words, the construction of the patent claimed by the complainant, viz. that *rear* means in rear of the face of the mold disc, is rejected. In my judgment the old style of linotype (No. 1) which is in evidence exhibits the principle of the Intertype construction, and I am inclined to think that the same thing is shown in the Mergenthaler linotype catalogues of 1892 and 1900, extracts from which are in evidence as Defendant's Exhibits 55 and 56.

The bill will be dismissed as to this patent.

### XIII. The Ejector Slide Disconnection Patent.

[20] This is Bedell, 848,338, with claim 4 in suit. The claim above mentioned is as follows:

"4. In a linotype machine, the ejector slide movable forward and backward, the actuating cam, connections from the cam to the slide, *and means operative from the front of the machine for effecting instantaneous disconnection and release of the slide at will*, whereby the operator at the front of the machine is enabled to move the slide forward at will without changing the position of the cam."

The italicized portion of this claim is the new element of the combination. Undoubtedly the claim will read on the Intertype, because it shows a method operative from the front of the machine for disconnecting the slide. The mechanism shown by the patentee is extremely simple, and so is that of the Intertype. By both it is made possible to effect the desirable disconnection from the front of the machine. The sole question is whether by the claim in suit Mr. Bedell succeeded in preventing (during the life of his patent) all other persons by any device whatever from disconnecting ejector slides without going to the back of the machine for that purpose, no matter how such disconnection might be accomplished.

I can add nothing more in justification of my belief that nothing but a pioneer invention of the most obvious kind is entitled to such a range of equivalents as would accomplish such a repression of ingenuity in others. The claim in suit must be confined to the device exhibited, or to a near mechanical equivalent thereof. No such equivalency is shown, and the bill is dismissed as to this patent.

The foregoing thirteen issues cover all the matters actually litigated in docket No. 10–311.

## XIV. The First Elevator Blade Patent.

[21] This is Rogers' reissue 13,489, with claims 6 and 7 in suit, and is the only patent as to which evidence was given in docket No. 10–266.

Composing machines based upon Mergenthaler patents became a commercial success when provided with fonts of matrices wherein each matrix possessed the capacity of forming one letter or figure only. There were, however, machines producing printing slugs in moderately successful operation contemporaneously with the earlier forms of the modern linotype.

Such machines used matrices of a character differing radically from those provided for either the No. 5 or the Intertype. For example the Monoline, made under the Scudder patent, 506,198, and the Mergenthaler "band" device, made under patent 313,224. These systems did not use circulating matrices in the sense in which that phrase is applicable to the linotype and Intertype. Each shows comparatively few matrices, each having upon it either an entire alphabet or a considerable part of the same.

In order to arrange such multi-letter matrices so as to produce a printing slug, it was obviously necessary to severally support them in positions that would bring the letters of the words intended to be printed in a common line; and such letters could not, of course, always be formed by matrical recesses occupying identical positions on the several matrix bars. It may be said that this necessary arrangement of these lengthy matrix bars was accomplished (in such machines as those last mentioned) by the advancement of a bar or blade fitting into an appropriate recess in the matrix body.

When the linotype came into use, employing small matrices fed out of a magazine and returning thereto for use again, it was obviously desirable to economize in the number of matrices used by putting more than one character upon each matrix. Most obvious utility (for example) rested in the style of matrix shown to the court, on which the same letter or figure is repeated, one in roman type, the other in italic.

From the evidence herein Mr. Dodge, who was at once an inventor, a patent solicitor, and the president of the plaintiff company, was the first to think out the advantages to be derived from a system of circulating matrices of the plural letter variety. In his patent, 449,872, he disclosed matrices with two characters, but with the idea, not of varying the alignment of the matrices, but of casting two slugs at once.

I entirely agree with the complainant in the statement that the "fore-runner of the plural font system" is Mr. Dodge's patent, 547,633. This very interesting conception shows as perfected what, so far as the court is informed, is the modern matrix, and it also discloses means for assembling such matrices in the composing receptacle at varying heights, so that (for example) a line can be printed partly in roman and partly in italic. The line thus assembled by Dodge passes into the first elevator, and is presented to the mold, and the slug is cast; and there Dodge stopped. He discloses no means whatever of leveling his now unevenly arranged line of matrices, or getting them into the second elevator, and so on the road to redistribution.

I share the surprise manifested by several witnesses herein that so experienced and skillful a person as Mr. Dodge should have so limited, if not killed, the utility of his own concept. It has been suggested in argument that Mr. Dodge either (1) overlooked the question of distribution, or (2) intentionally failed to disclose means for leveling matrices, or (3) that he considered it a matter of mere mechanical skill, not worthy of his personal attention, to present to the world a means of leveling and distribution. Whether any of these hypotheses is correct cannot be affirmed; but he certainly did not long remain inactive, for his own patent having issued in October, 1895, he wrote in June, 1897 (in his capacity as president of complainant), to Mr. Rogers, and directed him to "fit a machine experimentally in accordance with my patent, 547,633. * * * You will, of course, feel at liberty to modify the details as may seem necessary. The main idea is to see whether we can assemble the matrices readily."

I am convinced by the testimony of Rogers himself that he produced in the summer of 1897, a workable device which rendered possible leveling and redistribution of double character matrices, and that such device went into commercial use in the printing establishment of Appleton & Co. in the early part of December, 1897. His application for a patent was filed March 25, 1898, and resulted in No. 615,909, granted December 13, 1898, of which the patent in suit is a reissue.

It may be said here that I perceive no reasonable objection to the granting of this reissue. There had been a misnomer in the patent as issued, whereby second elevators were spoken of, whereas first elevators were clearly meant. It has not been denied that this was a mistake which prejudiced no one, and it was properly corrected by the reissue.

In producing the result which Mr. Dodge had commanded, and in doing what amounted to a perfecting of Dodge's partial success, Rogers produced an invention whereof (as he says) the essence is:

"(1) In the employment of a *yielding or spring-supported bar* to sustain the matrices in the first elevator; and (2) in the employment of means for automatically effecting the retraction of the bar."

He then claims as covering the invention thus summarily described:

"(6) In a linotype machine employing matrices with two characters each, an elevator *N*, provided with a movable blade to sustain part or all of the matrices above their normal position.

"(7) In a linotype machine the first elevator provided with a movable ma-

trix supporting blade in combination with means for automatically retracting the same."

It is not denied that both of these claims read directly upon the Intertype. The defense is that the claims are larger than the invention, whether that assertion be viewed from (a) the state of the prior art, or (b) the language of Rogers' specification.

The argument from the prior art is based principally upon a study of the Monoline and the Mergenthaler band machines, plus another Mergenthaler variant (which may be called the inclined table machine), shown in Mergenthaler patent, 614,230. Of these references it seems to me enough to say that 614,230 has been shown conclusively as wholly inoperative. This condition results from the demonstrated fact that if power sufficient to position the matrix supporting blade is furnished, that power renders the functioning of the blade in the manner desired and asserted by Mergenthaler impossible.

But, even if this were not true, all three of these machines do no more than to exhibit the possibility of supporting an indented body on a retractable blade, which, when withdrawn, permits gravity to operate. This seems to me so obvious that the mere employment of a retractable blade would hardly seem to rise to the dignity of invention. But, even if invention there resides, one is as far as ever from solving the question of how to realign, not heavy matrix bars, but light, single matrices, in such wise as to permit their passage from the first to the second elevator in an arrangement different from that in which the first elevator received them.

I do not think that the prior art so far as disclosed materially narrowed the field of invention, because that art had dealt with a kind of matrix or matrix bar so utterly different from the small circulating pieces of metal used by the linotype and the Intertype as to leave for Mr. Rogers almost, if not quite, a new field for human ingenuity.

Reverting for a moment to the hypothesis above enumerated as to the state of Mr. Dodge's mind after getting his own patent of 1895, it may be added that, after seeing and briefly hearing Mr. Dodge in this case, I am quite seriously impressed with the belief that he did not show means for realigning and distributing his double character matrices solely because he did not know how to do it. And the fact that he did not know is to me a substantial piece of evidence that it was something that demanded serious thought on the part of some one, and that (whatever others may have done) Mr. Rogers contributed that thought has not been denied herein.

The argument for narrowing the scope of the claims based upon the language of the specification itself is to me more persuasive and more difficult to answer. As above noted, Rogers stated that the essence of his invention lay in the employment of a "yielding or spring-supported bar," he shows in his drawings a bar positioned by spring pressure, and retraction is effected by pressure upon the spring positioned lever or latch—which by said pressure is caused to remove from the upward positioned matrices the support which determined said position—and that support is a bar or blade.

If this bar or blade is examined in an idle machine it may be pressed

back by the fingers, and it is unquestionably not only spring-supported, but yielding in the sense of being resilient; i. e., when it is pressed back by one's fingers it returns to its original position when the fingers are removed. The Intertype shows a construction wherein no spring is employed; the bar or blade cannot be pressed back in an idle machine by any pressure, but is positively retracted.

[22] These facts give rise to the argument that Rogers' words "yielding" and "spring-supported" must be considered synonymous, so that any device, however productive of the same result, which does not employ a spring-supported blade, is not an infringement. That no such limitation was in Rogers' mind is matter of positive proof herein, for the device which he made in the fall of 1897 and employed in the Appleton shop has been produced and satisfactorily identified. It is the exact mechanical equivalent—indeed, almost the mechanical counterpart—of what the defendant is doing, in that it has a retractable blade positively actuated, and not spring-supported, nor resilient.

There has been one litigation (and in this circuit) which largely raged around the meaning of the word "yielding"—Palmer v. Jordon Machine Co. (C. C.) 186 Fed. 496 (see especially page 501), reversed in 192 Fed. 43 (see especially page 44), 112 C. C. A. 454. The same patent was considered again in Palmer v. Superior Mfg. Co. (D. C.) 203 Fed. 1003, and again there was a reversal in 210 Fed. 452, 127 C. C. A. 284. It may at least be said of the litigation thus reported that the appellate court gave a very generous interpretation to the word "yielding."

In my opinion, Rogers is entitled to quite as generous treatment. There was no sense in the expression "yielding or spring-supported," if both adjectives meant the same thing. He had demonstrated that a spring support was not necessary, and it is, I think, no more than a fair view, even of the specification language, to interpret the phrase above quoted disjunctively, and to apply to the word "yielding" the meaning of retractable at will.

But, even if I am in error in believing that "yielding" may be so interpreted in the light of the prior art as to apply to defendant's device, it is, I think, plainly true that even if the blade or bar of the Intertype's first elevator is not yielding, and is not spring-supported, it is the plain mechanical equivalent of the preferred embodiment of Rogers' invention, and as such is an infringement, even if Rogers is to be confined to the mechanical equivalents, not of what he claims, but what he shows in his patent papers.

There remains to notice but an alleged prior use subsequently embodied in a patent to Harvey, 618,348. This patent was in the office at the same time as Rogers', and to it must be applied the doctrine to which I gave adherence at the beginning of this memorandum. That doctrine is perhaps here unimportant, for I am further of opinion that by positive and satisfactory evidence Rogers has carried back the date of his invention to the summer of 1897.

Harvey is dead, and the evidence in support of his prior use certainly does not rise to the dignity of producing conviction beyond a reasonable doubt. The best that can be said for it is that Harvey put

his plan into operation "in 1897," and that is very far from producing certainty as to invention before *the summer* of 1897.

The complainant may take a decree on this patent, concerning which it may be added that I consider it more of an invention and better entitled to a broad range of equivalents than any other of the devices as to which evidence has been introduced in this rather protracted litigation.

In the case docketed as 10–311, the complainant has (so far as this court is concerned) so slightly succeeded that no costs will be awarded. In that docketed as 10–266, complainant will take the usual decree, with costs.